## FIDELITY AND GUARANTY INSURANCE UNDERWRITERS, INC.

V.

## ALLIED REALTY COMPANY, LTD.

Record No. 880273

September 22, 1989

Present: All the Justices

A. James Kauffman (Clayton L. Walton; Taylor, Hazen & Kauffman, on briefs), for appellant.

John R. Walk (Lawrence E. Luck; David W. Robinson; Hirschler, Fleischer, Weinberg, Cox and Allen, on brief), for appellee.

Justice Lacy delivered the opinion of the Court.

The question for decision in this appeal is whether coverage exists under a multi-peril insurance policy. Three issues are raised: (1) whether the loss suffered by the insured was required to be and, as a matter of law was, fortuitous in nature; (2) whether the loss specifically was excluded from coverage under the terms of the policy; and (3) whether the damage award improperly included elements beyond the scope of the policy.

Allied Realty Company, Ltd. (Allied) filed a motion for judgment against Fidelity and Guaranty Insurance Underwriters, Inc. (F&G) alleging that damage to its warehouse was covered by a multi-peril policy issued by F&G and seeking recovery of $428,894. F&G denied coverage. The case was tried by a jury which returned a verdict for the insured and fixed Allied's damages at $395,642.69. F&G filed an appeal from the judgment entered on the verdict. We affirm.

Allied owns warehouse property in Charlottesville. The structure is located at the base of a hill and consists of a group of interconnected single-story warehouse units constructed of cinder block and steel-reinforced concrete.

In the early 1970's, Allied used cinder blocks to extend the rear wall above the roof line of the buildings. Fill material and concrete were poured between the rear cinder block wall of the warehouses and the hillside. This created a level area above and behind part of the single-story warehouses. Allied placed five house trailers on this level ground.

In July 1985, Allied discovered a number of cracks in some of the warehouse walls. Allied's architect examined the rear walls and shear walls of the buildings and concluded that the rear walls of buildings Nos. 28 and 26 had rotated inward on their axes. Concluding that the structural components of the building had failed, the architect contacted the engineering firm of Dunbar, Milby & Williams. The engineering firm as well as city building officials inspected the warehouse, determined that the warehouse units were unsafe for occupancy, and condemned the property. The tenants in the three trailers above and behind the warehouse,

as well as those occupying three trailers next to the warehouse, were asked to vacate due to the risk of possible damage to the trailers.

In December 1983, Allied had purchased a special multi-peril insurance policy issued by Fidelity and Guaranty Insurance Underwriters, Inc. through Cabell Insurance Associates, Inc. Allied's policy was effective from December 1, 1983, through December 1, 1986. In September 1985, Allied made a claim to F&G for costs associated with the removal of the fill, reinforcing the structural support of the wall, and other remedial work under its multi-peril policy. After investigating the claim, F&G denied coverage.

At trial, Allied presented five expert witnesses who testified that excessive earth pressure was the sole cause of the structural failure of the warehouse. Each expert also specifically testified that earth movement and water pressure did not contribute to the warehouse damage. F&G took the position at trial and on appeal that Allied's loss was not a fortuitous loss and, therefore, not a peril insured against under the policy. Additionally, F&G maintains that Allied's loss fell within the exclusionary portions of the policy and that Allied's alleged damages did not arise from direct physical loss but were remote and consequential. We consider these points in order.

## FORTUITOUS EVENT

Although F&G issued Allied a "multi-peril" policy, this broad coverage covers only *risks* and, as such, affords no coverage for a loss that is certain to occur. This Court has not directly addressed the fortuity issue presented under an "all risk" insurance policy. Other courts, however, have analogized fortuity to contract law and have defined a "fortuitous event" as an event dependent on chance to the extent "that the parties to the contract are aware." *See* Restatement Contracts § 291, comment (a) (1931); *see also Goodman* v. *Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042 (4th Cir. 1979). A fortuitous loss is one that does not result from any inherent defect in the property insured, ordinary wear and tear, or intentional misconduct. A loss resulting in part from an insured's negligence, however, may still come within the definition of a fortuitous loss. *Goodman*, 600 F.2d at 1042; *Avis* v. *Hartford Fire Ins. Co.*, 283 N.C. 142, 149-50, 195 S.E.2d 545, 548 (1973); *see generally*, S. Cozen and R. Bennett, *Fortuity:*

*the Unnamed Exclusion*, 20 Forum 222 (1985) (discussing development of fortuity doctrine).

█ When addressing the doctrine of fortuity, some courts have interpreted "fortuitous" as analogous to the insurance policy term "accident." For example, in *Insurance Co. of North America* v. *U.S. Gypsum*, 678 F. Supp. 138, 141 (W.D.Va. 1988), the United States District Court for the Western District of Virginia construed the term "accident" by focusing on the unplanned and unintentional nature of the damage instead of the fact that the damage was a physical certainty or something inevitable. The *U.S. Gypsum* court also noted that, in *Monterey Corp.* v. *Hart*, 216 Va. 843, 850, 224 S.E.2d 142, 147 (1976), this Court had defined accidental "in the same manner as Black's Law Dictionary, to wit: 'happen by chance, or unexpectedly; taking place not according to the usual course of things; casual; fortuitous.'" *Id.* at 142.

F&G maintains that Allied deliberately filled in the areas behind the warehouse rear wall and that, as early as 1978, Allied was aware of cracking, bulging, and deterioration. Citing a letter received by Allied from its construction engineer, F&G alleges that Allied knew it was inevitable that the wall would fail structurally and, therefore, no insurable risk was covered by the policy.

█ Examining the record, we find no evidence to establish that, when Allied and F&G entered into the insurance contract in 1983, either of them knew that the retaining wall inevitably would fail to support the fill.[1] Although Allied's own experts testified that they would have designed the wall differently, there was no certainty that the wall would not support the fill or that the wall's failure was destined to occur within the time limits of Allied's policy.

Moreover, it would be inappropriate for this Court, with the aid of hindsight, to determine that Allied's damage was not a fortuity such as was contemplated by the all-risk policy. *See Compagnie des Bauxites* v. *Insurance Co. of North America*, 554 F. Supp. 1080 (W.D.Pa.), *rev'd* 724 F.2d 369 (3d Cir. 1983) (when determining whether or not loss is fortuitous, court should not look upon it as a matter of hindsight). When considering the parties'

---

[1] F&G argued that remedial work completed on the retaining wall in 1978 demonstrated that Allied knew that the wall inevitably would fail. The record, however, does not support F&G's contention. In 1978, Allied's repairs corrected the external cracking and the spalling of the upper wall of the warehouse, not the back wall of the warehouse which rotated in 1985.

knowledge at the time they entered into the insurance contract, we conclude that neither party regarded the loss as "inevitable." ∎ Our finding that Allied's loss is a fortuitous event under the policy, however, does not mean that the loss cannot fall within a contractual exclusion from coverage. Accordingly, we must address the possible applicability of any of the policy exclusions to Allied's claim.

## POLICY EXCLUSIONS

F&G asserts that the policy excludes coverage of Allied's loss on three separate grounds: the loss was occasioned by earth movement; the loss was caused by an inherent defect; and the loss was a result of enforcement of a city ordinance. The insurer has the burden to prove that the terms of the policy exclude coverage of a loss. *White* v. *State Farm Mutual Ins. Co.*, 208 Va. 394, 396, 157 S.E.2d 925, 927 (1967). F&G failed to carry its burden of proof.

### A. *Earth Movement*

Allied's multi-peril policy expressly states as follows:

This policy does not insure under this form against:

D. Loss caused by, resulting from, contributed to or aggravated by any of the following:

1. earth movement, including but not limited to earthquake, landslide, mudflow, earth sinking, earth rising, or shifting . . . .

The issue of whether the loss was occasioned by "earth movement" as maintained by F&G or "earth pressure" as maintained by Allied, constituted a significant part of this litigation.

At trial, Allied presented five expert witnesses who testified that excessive earth pressure was the sole cause of the structural failure of the warehouse. Each expert also specifically testified that earth movement and water pressure did not contribute to the warehouse damage. F&G maintained, however, that the trial court erred in not sustaining its motion to strike after Allied presented its evidence because the earth behind the retaining wall obviously had to shift when the rear wall moved, thereby "contrib-

uting to" or "aggravating" the loss. As such, the loss specifically was excluded under the policy.

■ The trial court, however, determined that whether Allied's loss was a result of earth movement or earth pressure was a question of fact for the jury to resolve. We agree. The causation of a loss in this instance, as in most instances, is a factual determination, one appropriately submitted to the determination of the trier of fact. *Am. Nat. Ins. Co.* v. *Branch*, 168 Va. 478, 191 S.E. 668 (1937).

The expert witnesses presented by Allied explained the difference between earth pressure and earth movement. Dr. R.G. Larew testified that there are two types of earth pressure. Earth pressure at rest is a condition where soil has not had an opportunity to stretch because it is restrained by a barrier such as a wall. Active earth pressure involves the soil stretching, which allows the soil to carry some of its own weight and reduce the pressure. He testified that a wall ordinarily is designed to move slightly to accommodate active earth pressure. If a wall does not accommodate active earth pressure, the soil does not stretch and bear any of its own weight. Consequently the pressure on the wall is intensified. Dr. Larew indicated that, in his opinion, the failure of the rear wall of the building was due to the extensive pressure of the soil, or earth pressure at rest. He described it as a phenomenon distinct from earth movement which he described as movements which can be seen on the face of the earth and which result in scarring of the earth.

■ F&G's expert testified that earth pressure could exist independently of any earth movement. On the basis of this testimony, there was adequate evidence for the jury to determine that Allied's loss was caused by earth pressure rather than earth movement.

## B. *Inherent Defects, Bulging, Deterioration*

Paragraph E. of the exclusionary section of the policy excludes loss caused by "deterioration . . . inherent or latent defect . . . cracking [or] bulging . . . of pavements, foundations, walls . . . unless loss by a peril not otherwise excluded ensues and then the Company shall be liable for only such ensuing loss."

F&G argues that signs of deterioration, cracking and bulging in the retaining wall were evident seven years before Allied filed its claim under the policy. Furthermore, F&G maintains that, since

the evidence showed that the retaining walls were not constructed to withstand the amount of fill placed behind them, they were inherently defective, and that defect was the cause of the loss.

■ As discussed above, however, the jury determined the loss was caused by earth pressure, a "peril not otherwise excluded." Therefore, coverage is not defeated under this exclusion.

## C. *Enforcement of Building Codes*

F&G asserts that the losses suffered by Allied were the result of the enforcement of the city's building ordinances. The city condemned Allied's property in July 1985. Although Allied sought to reoccupy the property in September, the condemnation was not lifted until February 1986.

Paragraph A. of the exclusion section of the policy excludes loss "occasioned directly or indirectly by enforcement of any ordinance or law regulating the use, construction, repair, or demolition of buildings or structures including debris removal expense." This provision also served as a basis for F&G's denial of coverage.

■ Allied's evidence indicated that it had taken steps to vacate the damaged and unsafe premises prior to any attempt by Charlottesville to condemn the property. Tenants were removed during the period of repair until the safety of the warehouses was reestablished. Furthermore, as discussed above, the loss was occasioned by earth pressure resulting in the structural failure of the warehouse. F&G did not carry its burden to show that condemnation by the city caused Allied's loss.

## DAMAGE AWARD

Turning to the jury's award of damages, F&G argues that much of the remedial work to Allied's property was unrelated to the damages to the warehouse insured under the policy. Specifically, F&G complains of expenses incurred relating to construction loan interest, removal of the retaining wall, lost rents, and landscaping and seeding. F&G concludes that Allied's expenses for these items were remote and consequential, that the insurance policy did not cover such expenditures, and that, as a matter of law, Allied should not be permitted to recover the damages.

■ We have already held that construction interest costs are direct damages and therefore compensable. *Roanoke Hospital* v. *Doyle and Russell*, 215 Va. 796, 214 S.E.2d 155 (1975). Like the

construction interest in *Roanoke Hospital*, Allied's construction interest was a foreseeable result of F&G's denial of coverage.

■ F&G's policy specifically covers buildings including "attached additions and extensions" but not "retaining walls not constituting a part of a building". It was uncontroverted at trial that the cinder block retaining wall physically was attached to the warehouse. The wall, therefore, was an "addition to the structure" that "extended" from it. We hold that it was a question of fact whether the cinder block wall was covered by the policy's definition of the warehouse. Again, the jury resolved this issue of coverage in favor of Allied.

■ Similarly, consideration of whether the policy rental endorsement covered all Allied's claims for lost rents was a fact determination properly submitted to the jury.

■ Finally, although the damage amount awarded for landscaping and seeding is unclear, such an award was to be determined pursuant to Jury Instruction No. 28. That instruction stated:

> INSTRUCTION NO. 28: The policy of insurance does not insure growing lawns. If you find that the costs of seeding and landscaping were a reasonable and necessary part of the repair and/or replacement of insured property then plaintiff may recover for such costs. If you find that such costs were associated with replacement of growing lawns then plaintiff may not recover for such costs.

F&G neither objected to this instruction nor assigned error to it. As the law of this case, therefore, the jury properly could award direct damages for landscaping and seeding.

■ Allied's uncontested out-of-pocket expenses totaled $428,894.00. After evaluating each element of damage, the jury returned a lesser verdict of $395,642.69. We find no basis to conclude that this amount improperly includes elements beyond the scope of the multi-peril policy.

For the reasons set out above, we will affirm the judgment of the trial court.

*Affirmed.*