UNDERWRITERS SUBSCRIBING TO
LLOYD'S INSURANCE CERT.
NO. 80520, Plaintiffs,

v.

MAGI, INC., Defendant.

No. CS-90-0521-FVS.

United States District Court,
E.D. Washington.

Oct. 17, 1991.

Sharon Hazzard, Danielson, Harrigan & Tollefson, Seattle, Wash., for Underwriters Subscribing to Lloyd's Ins. Certificate No. 80520.

James M. Danielson, Jeffers Danielson Sonn & Aylward, Wenatchee, Wash., for Magi, Inc.

## OPINION

VAN SICKLE, District Judge.

### A. PARTIES

The plaintiffs in this action are Underwriters at Lloyd's London (hereinafter "Underwriters"). They request a judicial determination that an insurance certificate to which they have subscribed does not cover damage to apples which were stored in a warehouse operated by the defendant, Magi, Inc. (hereinafter "Magi"). Magi has filed a counterclaim. It asks the Court to hold Underwriters must pay the amount claimed, together with damages, attorney fees and costs.

### B. JURISDICTION/VENUE

It is not disputed Underwriters are residents of Great Britain; Magi is a Washington corporation whose principal place of business is in the Eastern District of Washington; and the amount in controversy exceeds fifty thousand dollars. The parties agree the Court has jurisdiction under 28 U.S.C. § 1332(a)(2), and venue is proper pursuant to 28 U.S.C. § 1391(a).

### C. SUMMARY

Magi is a co-operative association of approximately one hundred eighty-six member orchardists who grow, store, and sell apples. It operates warehouses in three separate locations in Okanogan County, Washington. Mr. George Chapman is Magi's president and chief executive officer.

In 1989, Underwriters renewed an insurance policy which had previously been issued to Magi. The new policy, which bore certificate number 80520, insured against damage to stored apples from June 1, 1989, to June 1, 1990.

During February of 1990, Magi discovered Golden Delicious apples in its Okanogan warehouse were damaged, and filed a claim with Underwriters. Although an independent adjuster recommended payment of the claim, Underwriters declined to do so, arguing the loss was not fortuitous and therefore not compensable.

The Court holds as follows: (1) the policy covers Magi's loss in the amount of Three Hundred Seventy-seven Thousand, One Hundred Dollars ($377,100.00); (2) Magi is entitled to prejudgment interest from the date the proof of loss was submitted; and (3) Underwriters did not violate Washington's Consumer Protection Act.

### D. BACKGROUND

Each autumn, a new crop of apples is harvested. Some of the apples are processed, packed into containers and sold immediately. But those apples which are of sufficient quality are stored in warehouses and sold when prices warrant, which may be many months later.

Once apples are placed in storage, they begin to deteriorate. To limit deterioration, apples are stored in specially designed warehouses which are known as "controlled atmosphere" or "CA" warehouses.

A controlled atmosphere warehouse is divided into large "rooms." Each room is a separate storage area which can be sealed. Once a room has been sealed, the operator of the warehouse can set the temperature, oxygen content, carbon dioxide content, and humidity in the room. In effect, the operator can create an artificial environment in each of the storage areas in the warehouse.

The storage of apples under artificially maintained conditions is not without risk. As a result, it is common practice for the operator of a warehouse to purchase insurance against the possibility apples will be damaged while in the operator's care. The scope of insurance coverage available to a warehouse operator fluctuates with the market; which means the operator of a warehouse can never be sure, from year to year, exactly which risks an insurance company will be willing to underwrite.

To obtain the policy which is at issue here, Magi went to Mr. Keith W. Anderson, an insurance broker. By working through an intermediary, Mr. Anderson obtained a policy from Global Special Risks, a San Francisco firm. Global Special Risks is an agent of Underwriters, and had authority to issue the policy on Underwriters' behalf.

The 1989 harvest appeared to proceed normally. Part of the crop consisted of Golden Delicious apples, which were stored in nine separate rooms in a controlled atmosphere warehouse in Okanogan, Washington. During January and February of 1990, the first of the Golden Delicious apples which had been placed in the Okanogan warehouse were removed from storage. On February 22, 1990, Mr. Chapman was notified apples were showing signs of damage. Typically, it consisted of brown discoloration over significant areas of the skin of the apple. Once informed of the damage, Mr. Chapman retained Dr. Kenneth Olsen, a horticulturalist, who visited the plant on March 15, 1990, and inspected Golden Delicious apples which had been removed recently from storage.

During March, 1990, Magi submitted notice of the loss, and Underwriters hired an independent adjuster, Maxson Young Associates, Inc., to investigate the claim. The actual investigation was conducted by a Mr. R.A. Porterfield, who examined and photographed damaged fruit at the Okanogan warehouse during a visit which occurred on March 27, 1990. As part of the investigation, Mr. Porterfield took samples of damaged apples to Dr. Olsen for analysis. When Mr. Porterfield was satisfied the loss fell within the coverage of the policy, and was not among the excluded perils, he recommended that the claim be paid. That was done by reports dated May 14, 1990, and June 12, 1990, copies of which were sent to Mr. Chapman.

Underwriters did not respond immediately to Mr. Porterfield's recommendation. As the weeks went by, Mr. Chapman began to feel acute pressure from growers whose apples had been damaged. Believing the claim would be paid, Mr. Chapman made partial payment to co-op orchardists during late July or early August of 1990 for Golden Delicious apples from the 1989 crop.

However, Underwriters decided not to pay the claim, and a representative of Global Special Risks so informed Mr. Chapman during the last week of August.

## E. FINDINGS OF FACT/CONCLUSIONS OF LAW

### 1. Fortuity

Underwriters deny Magi's loss was fortuitous. If correct, they have no obligation to pay Magi's claim.

■ The policy which was issued to Magi is an "all-risk" insurance policy. *Dickson v. United States Fidelity and Guaranty Co.*, 77 Wash.2d 785, 789–90, 466 P.2d 515 (1970); *Bryant v. Continental Insurance Co.*, 2 Wash.App. 37, 38, 466 P.2d 201 (1970). *See Standard Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F.Supp. 164, 190 (D.Conn.1984). All-risk insurance creates a "special type of coverage extending to risks not usually covered under other insurance." 13A G. Couch, R. Anderson & M. Rhodes, Couch Cyclopedia of Insurance Law, § 48:141 (2d ed.rev. 1982). The term "all-risk" should not be confused with the words "all loss," however. *Intermetal Mexicana, S.A. v. Insurance Company of North America*, 866 F.2d 71, 75 (3d Cir. 1989) (and cases cited therein). "[R]ecovery under an 'all-risk' policy will, as a rule, be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage." 13A G. Couch, R. Anderson & M. Rhodes, Couch Cyclopedia of Insurance Law, § 48:141 (2d ed.rev. 1982). *See* 5 Appleman, Insurance Law and Practice, § 3092 at 371 (1970).[1]

Regardless of its express terms, every all-risk policy " 'contains an unnamed exclusion—the loss must be *fortuitous* in nature.' " *Intermetal Mexicana, S.A. v. In-*

---

**1.** However, in *Standard Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F.Supp. 164, 191 (D.Conn.1984), the court appeared to approve the following four-part test taken from *Avis v. Hartford Fire Insurance Co.*, 283 N.C. 142, 195 S.E.2d 545, 548–49 (1973):

'(1) The loss must be fortuitous ... (2) The loss must not result wholly from an inherent quality or defect in the subject matter ... [it] must result from at least one extraneous cause ... (3) The loss or damage must not result from the intentional misconduct or fraud of the insured ... [and] (4) The risk must be lawful.'

surance Co. of North America, 866 F.2d 71, 75 (3d Cir.1989) (citing Cozen & Bennett, *Fortuity: The Unnamed Exclusion*, XX Forum 222, 222 (Winter 1985)) (emphasis in original). The exclusion exists as a matter of public policy, because "it would encourage fraud to allow recovery on an insurance loss which is certain to occur." *Insurance Co. of North America v. U.S. Gypsum Co.*, 678 F.Supp. 138, 141 (W.D.Va.1988) (citation omitted), *aff'd*, 870 F.2d 148 (4th Cir.1989).

■ Resolution of Underwriters' argument requires definition of the term "fortuitous," which must be decided according to Washington law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Since the Washington Supreme Court has yet to do so, it is this Court's duty to attempt to anticipate what that definition will be. *See Kisor v. Johns-Manville Corp.*, 783 F.2d 1337, 1340 (9th Cir.1986).

The parties have proposed competing definitions for the word "fortuitous." Underwriters submit the word "fortuitous" has essentially the same meaning as "accident," as that term has been defined in accident insurance policies in Washington. Underwriters cite *Harrison Plumbing & Heating, Inc. v. New Hampshire Ins. Group*, 37 Wash.App. 621, 624, 681 P.2d 875 (1984), which says, "An accident is never present when a deliberate act is performed unless some additional unexpected, independent and unforeseen happening occurs which produces the damage.... To be an accident, both the means and the result must be unforeseen, involuntary, unexpected, and unusual...." (Citations omitted.) Magi, on the other hand, cites

*Avis v. Hartford Fire Insurance Co.*, 283 N.C. 142, 195 S.E.2d 545, 548 (1973) (quoting Webster's Third New International Dictionary, p. 895 (1961)), which says, "The word 'fortuitous' means 'occurring by chance without evident causal need or relation or without deliberate intention.' "

Since the Washington Supreme Court has yet to define the word "fortuitous," and the parties do not agree upon its meaning, it is useful to examine decisions from other jurisdictions. A review of cases decided during the past fifteen years reveals a significant trend. While courts continue to agree that an all-risk insurance policy covers only fortuitous losses,[2] a new definition of the term "fortuitous" has emerged. It is now generally accepted that the term should be defined as provided in the Restatement of Contracts.[3] *See, e.g., Adams–Arapahoe Joint School District No. 28–J v. Continental Insurance Co.*, 891 F.2d 772, 775 (10th Cir.1989) (Colorado law); *Compagnie des Bauxites de Guinee v. Insurance Co. of N. Am.*, 724 F.2d 369, 372 (3d Cir.1983) (Pennsylvania law); *Morrison Grain Co., Inc. v. Utica Mutual Insurance Co.*, 632 F.2d 424, 430–31 (5th Cir.1980) (Louisiana law); *Kilroy Industries v. United Pacific Insurance Co.*, 608 F.Supp. 847, 858 (D.C.Cal.1985) (opining that both California and Washington would "adopt the Restatement and the Third Circuit definition"); *Mattis v. State Farm Fire & Cas. Co.*, 118 Ill.App.3d 612, 73 Ill.Dec. 907–915, 454 N.E.2d 1156, 1164 (1983). The implications of the modern trend were summarized in an article which is often cited in discussions of the fortuity doctrine. The authors noted:

**2.** *See, e.g., Peters Township School District v. Hartford Accident and Indemnity Co.*, 833 F.2d 32, 37 (3d Cir.1987) (Pennsylvania law); *Ingersoll Milling Machine Co. v. M/V Bodena*, 829 F.2d 293, 307 (2d Cir.1987) (federal maritime law and Illinois law held to be consistent on issue); *U.S. Industries, Inc. v. Aetna Casualty & Surety Co.*, 690 F.2d 459, 461–62 (5th Cir.1982) (Louisiana law); *Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042 (4th Cir.1979) (Maryland law); *Texas Eastern Transmission Corp. v. Marine Office–Appleton & Cox Corp.*, 579 F.2d 561, 564 (10th Cir.1978) (Oklahoma law); *Fidelity & Guaranty Insurance Underwriters, Inc. v.*

*Allied Realty Co., LTD.*, 238 Va. 458, 384 S.E.2d 613, 615 (1989).

**3.** Restatement of Contracts, § 291, comment "a" (1932), provides in pertinent part:

A fortuitous event ... is an event which so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, such as the loss of a vessel, provided that the fact is unknown to the parties.

Courts increasingly analogize to contract law, which defines "a fortuitous event" as one dependent on chance insofar "as the parties to the contract are aware." This converts the doctrine from an objective standard ("Was the loss certain to occur?") into a subjective one ("Did the insured know that the loss was certain to occur when the policy was issued?").

Cozen & Bennett, *Fortuity: The Unnamed Exclusion*, XX Forum 222, 223 (Winter 1985) (quoting Restatement of Contracts, § 291, comment "a" (1932)).

The question of fortuity usually arises after a loss has occurred and the insured has made a claim for payment. It is at that point the insurance company raises fortuity as a defense. Some courts have been inclined to determine fortuity based upon knowledge gained from hindsight. *E.g., Compagnie Des Bauxites De Guinee v. Insurance Co. of North America*, 554 F.Supp. 1080, 1083–85 (W.D.Pa.1983), *rev'd*, 724 F.2d 369 (3d Cir.1983). The modern rule rejects that approach. *Adams–Arapahoe Joint School District*, 891 F.2d at 775; *Compagnie des Bauxites de Guinee*, 724 F.2d at 372. It requires a court to ask whether, at the time the policy was issued, the parties could reasonably have foreseen the loss.

The modern understanding of the fortuity doctrine has been shaped by the requirements of public policy, and a lively debate regarding the proper approach to the determination of certainty of loss. By contrast, Washington's definition of the term "accident" is derived from the interpretation of accident insurance policies in response to an entirely different set of considerations. *See, e.g., Detweiler v. J.C. Penney Ins.*, 110 Wash.2d 99, 104, 751 P.2d 282 (1988) (quoting *Unigard Mut. Ins. Co. v. Spokane Sch. Dist. 81*, 20 Wash.App. 261, 263–64, 579 P.2d 1015 (1978)); *Evans v. Metropolitan Life Ins. Co.*, 26 Wash.2d 594, 622, 174 P.2d 961 (1946); *Zinn v. Equitable Life Insurance Co.*, 6 Wash.2d 379, 392, 107 P.2d 921 (1940).

Underwriters assume the Washington Supreme Court would approve the substitution of the definition of an express term in an accident insurance policy for an implied term in an all-risk policy. The Court disagrees. First, Washington's definition of "accident" has been sharply criticized. *McKinnon v. Republic National Life Ins.*, 25 Wash.App. 854, 860–64, 610 P.2d 944 (1980) (Reed, C.J., concurring). More importantly, in *Rodriguez v. Williams*, 107 Wash.2d 381, 384, 729 P.2d 627 (1986), the Washington Supreme Court made a distinction between a policy which "purports to cover all personal injury" and one which is an " 'accidental occurrence' policy," declining to impute the definition of an "accidental occurrence" to the former. Although the definition of the term "accident" may be "well settled" as it relates to accident insurance policies, *Lloyd v. First Farwest Ins.*, 54 Wash.App. 299, 302, 773 P.2d 426 (1989), it seems unlikely the Washington Supreme Court would extend the definition to different terms in other types of insurance.

The Court believes the Washington Supreme Court would adopt a definition of the term "fortuitous" which is consistent with the modern trend. Regardless of the precise formulation, it is anticipated that the definition would include the following elements:

(a) a loss which was certain to occur cannot be considered fortuitous, and may not serve as the basis for recovery under an all-risk insurance policy;

(b) in deciding whether a loss was fortuitous, a court should examine the parties' perception of risk at the time the policy was issued;

(c) ordinarily, a loss which could not reasonably be foreseen by the parties at the time the policy was issued is fortuitous.

It is Magi's responsibility to prove its loss is fortuitous, *Intermetal Mexicana, S.A.*, 866 F.2d at 75; *Buckeye Cellulose Corp. v. Atlantic Mut. Insurance Co.*, 643 F.Supp. 1030, 1036 (S.D.N.Y.1986), though the burden is not "particularly onerous." *Morrison Grain Co., Inc.*, 632 F.2d at 430. Magi need not demonstrate the precise cause of damage for the purpose of proving fortuity. *Morrison Grain Co., Inc.*,

632 F.2d at 430; *Atlantic Lines Limited v. American Motorists Insurance Co.*, 547 F.2d 11, 13 (2d Cir.1976); *Pillsbury Co. v. Underwriters at Lloyd's, London*, 705 F.Supp. 1396, 1399 (D.Minn.1989); *Harbor House Condo. Ass'n v. Massachusetts Bay Ins. Co.*, 703 F.Supp. 1313, 1317 (N.D.Ill. 1988).

Underwriters' argument is based upon the fact Magi created the environmental conditions which existed in the rooms where the apples were stored. Underwriters contend storage conditions which are intentionally created cannot be fortuitous.

According to the modern rule, "A loss caused by a defective design is fortuitous if the insured had reason to rely on it." *Pillsbury Co.*, 705 F.Supp. at 1400. Thus, an improperly constructed conveyor system which could not handle the load placed upon it was a fortuitous loss even though the conveyor was doomed to fail before it was ever operated. *Compagnie Des Bauxites De Guinee v. Insurance Co. of North America*, 724 F.2d at 372, 373. A cavern which collapsed was a fortuitous loss where it had been constructed according to a plan which had been used successfully in the past despite the fact the precise cause of the collapse was never determined. *Texas Eastern Transmission*, 579 F.2d at 565, 566. Cans of cream-style corn which may have contained health-threatening organisms due to a failure in the canning process were a fortuitous loss where the process had been used satisfactorily before. *Pillsbury Co.*, 705 F.Supp. at 1399, 1400. As the *Pillsbury* court observed, "While the normal wear and tear or deterioration of property is not a fortuitous loss, inordinate decay due to the failure of normal preservative measures may be." *Id.* at 1400.

■ Underwriters have not stated the issue properly. The question is not whether the damage was certain to occur because of the storage conditions which Magi chose, but whether it was reasonable for Magi to choose the conditions which may have caused the damage.

The 1989 loss was not the first which Magi had experienced. In 1982, apples which Magi stored in one of its controlled atmosphere warehouses were damaged, and the evidence suggests the loss was a result of storage conditions. Underwriters contend the 1982 loss put Magi on notice that storage conditions could lead to injury to stored apples. Thus, Magi's choice of atmospheric conditions in 1989 was a calculated business decision based upon foreseeable risk.

After the 1982 loss, George Chapman had an independent firm test Magi's refrigeration equipment, and, in subsequent years, raised the temperature in the rooms in which apples were stored. No similar losses occurred thereafter. As a result, Magi had no reason to believe the temperature at which it was storing apples would cause further damage.

In 1987, Mr. Chapman conducted a review of the storage conditions Magi was then using. As part of the review, he consulted Dr. Kenneth L. Olsen, a recognized expert regarding fruit storage. Dr. Olsen advised Magi to store its apples at 31 degrees fahrenheit, and to reduce the oxygen content in each room to 1.5%.

Beginning in 1987, Magi attempted to follow Dr. Olsen's advice, at least to the extent Magi's equipment would allow. No significant damage occurred to stored apples during the first two years in which the new environmental conditions were used.

The record reflects, that in 1987, Magi's storage equipment was not capable of creating the precise conditions which Dr. Olsen recommended. Magi continued to improve the capacity of its equipment, so that by 1989, it was storing its Golden Delicious apples at 31 degrees fahrenheit in an environment where the oxygen content was at, or slightly under, 2%, although it never did meet the recommended 1.5%.[4]

---

**4.** Neither expert was asked to explain what effect, if any, the deviation from Dr. Olsen's recommendations may have had. Based upon the record before it, the Court cannot determine the consequences of the deviation. Even if it is assumed the deviation contributed to the loss, and Magi was negligent, Magi's negligence does not preclude a finding of fortuity. *Pillsbury Co.*, 705 F.Supp. at 1400 (citing *Morrison Grain Co.*, 632 F.2d at 431); *Baugh–Belarde Const. Co. v.*

Prior to the loss, Dr. Olsen was confident his recommendations were appropriate. Although no industry-wide standard existed, Dr. Olsen's recommendations were certainly consistent with the then-prevailing practice.[5] Thus, Magi's decision to follow Dr. Olsen's recommendations was reasonable.

The Court concludes neither Underwriters nor Magi could have foreseen Golden Delicious apples would be damaged by the storage conditions at the time the policy was issued. Under the modern rule, the loss was fortuitous.

### 2. Policy Interpretation

■ (a) Magi contends the loss which it suffered is covered by the policy. In support of its contention, Magi cites the first paragraph of Endorsement No. 4, which states:

> This insurance is extended to cover direct loss to harvested agricultural products caused by or resulting from extremes of temperature, improper oxygen concentration, improper carbon dioxide concentration or humidity.

(Ex. 500, at 9).

Magi maintains the apples were damaged because of the temperature and oxygen concentration in the room in which they were stored. Magi argues any temperature or oxygen concentration which causes damage is necessarily "extreme" or "improper," and the resulting loss is covered by the policy.

Underwriters deny coverage exists. Not only had Magi used virtually the same storage conditions during each of the two previous years without incident, but the conditions were consistent with prevailing practice. According to Underwriters, such conditions can be neither "extreme" nor "improper," regardless of whether they caused the loss.

*College Utilities,* 561 P.2d 1211, 1215 (Alaska 1977).

**5.** Underwriters' expert, Dr. Max Patterson, testified the storage conditions recommended by Dr. Olsen were appropriate, and could not have

Furthermore, Underwriters object to the implications of Magi's argument. If any temperature or oxygen concentration which causes damage is "extreme" or "improper," those adjectives have been effectively interpreted out of the policy.

■ As Underwriters note, the pivotal words are "extremes" and "improper," neither of which is defined by the policy. That being the case, each word is to be given its " 'plain, ordinary, and popular' meaning." *Boeing v. Aetna Casualty & Surety Co.,* 113 Wash.2d 869, 877, 784 P.2d 507 (1990) (citations omitted).

It is common to think of temperature in terms of a continuum, with freezing being at one end and boiling at the other. For example, *Webster's Third New International Dictionary* 807 (unabridged ed. 1981), defines "extreme" to mean, among other things, "something situated at, serving to mark, or terminating one end or the other of a total range or extent < the temperature in the desert ranges astonishingly between [extreme]s of heat and cold >." Thus, a temperature which is below freezing is ordinarily understood to be "extreme."

That is the sense in which the word is used in the policy. To the extent the apples were damaged as a result of being stored at 31 degrees fahrenheit, the damage resulted from "extremes of temperature."

The other word upon which coverage turns is "improper." Of it, *Webster's* says, "not suited to the circumstances, design, or end." *Id.* at 1137. According to the testimony of both experts, the oxygen content in a storage room is reduced in order to slow the rate at which harvested apples deteriorate. If, however, the oxygen concentration in a storage room damages apples, it is "improper" within the meaning of the policy.

damaged the apples. Presumably, had Mr. Chapman called Dr. Patterson in 1989, Dr. Patterson would have advised the use of the conditions which Magi was seeking to achieve at the time the loss occurred.

Underwriters propose a much more technical definition for the disputed terms. According to Underwriters, the phrases "extremes of temperature" and "improper oxygen concentration" should be construed to mean some significant deviation from storage conditions accepted across the industry.

There is nothing in the policy to suggest the parties intended each disputed word to have other than its " 'plain, ordinary, and popular' meaning." In reaching that conclusion, the Court acknowledges that when a contract uses technical language or terms of art, "the general rule is that such language is to be given its technical meaning," *Berg v. Hudesman*, 115 Wash.2d 657, 669, 801 P.2d 222 (1990). However, Underwriters have not demonstrated the disputed phrases are terms of art within the industry, much less that Underwriters' proposed definition is commonly accepted.

Furthermore, Underwriters' definition would all but eliminate coverage for damage attributable to a warehouse operator's choice of storage conditions. Under the proposed definition, "extremes of temperature" or "improper oxygen concentration" would occur when a warehouse operator chose storage conditions which deviated significantly from an industry norm. But damage which occurs because of a knowing deviation from an established standard would be foreseeable. Even under the modern rule, such a loss would not be fortuitous. It is unreasonable to suppose the parties intended to define decisive terms of the policy so as to defeat coverage for the very risk which was to be insured against.[6]

To summarize, "extremes of temperature" and "improper oxygen concentration" include storage conditions which damage apples, even though the conditions were deliberately selected by the warehouse operator. Having defined the disputed terms, the Court must decide whether Magi has proved its loss is covered.

Dr. Max E. Patterson, a professor at Washington State University and noted authority regarding the storage of fruit, testified Magi's apples appeared to be suffering from a mild case of ordinary or superficial scald.[7] According to Dr. Patterson, scald is often a delayed consequence of climatic conditions during harvest. He theorized the apples had been sunburned, arguing that was the most likely cause of the damage. He was very emphatic that scald is not caused by storage of apples at 31 degrees fahrenheit in 1.5% oxygen.

Dr. Patterson testified that discoloration which is caused by improper oxygen content will have different characteristics than that which is caused by scald. Whereas damage attributable to the former manifests itself in discrete areas of discoloration, discoloration from scald is more diffuse. Dr. Patterson said the damage which he saw was more consistent with scald than improper oxygen content.

However, Dr. Patterson conceded his knowledge of the damage to the apples came from photographs which he was shown shortly before trial. (There is some indication the photographs were over-exposed, thus limiting their probative value. (Ex. 511, at 6).) He further conceded he had no specific knowledge of the quality of the apples when they were placed in storage. Finally, he acknowledged his theory

---

**6.** That Endorsement No. 4 covers damage due to a warehouse operator's choice of storage conditions is supported not only by the language of the endorsement, but also by other provisions in the policy. Subparagraph "f" of Endorsement No. 4 excludes coverage for loss which is caused by, "Exceeding the normal storage life of the agricultural products." Clearly, that exclusion refers to the operator's choice of storage conditions, and was included to limit the operator's discretion. Such an exclusion would be unnecessary if Endorsement No. 4 did not cover deliberately selected conditions. Furthermore, Endorsement No. 3 covers "damage to fruit caused

by ... any variation in temperature which is attributable" to mechanical failure of a type described in the endorsement. (Ex. 500 at 5). That being the case, Endorsement No. 4 must cover damage due to a non-mechanical cause. The most probable non-mechanical cause of damage would be an operator's choice of storage conditions.

**7.** "Scald" is a condition which is caused by the death of cells in the skin of the apple. As cells die, the skin of the apple turns brown.

of causation would be seriously weakened if, in fact, the apples had sustained damage on all sides, not just the one facing the sun.

Dr. Patterson's conclusions were vigorously disputed by Dr. Kenneth Olsen, an equally distinguished expert. Dr. Olsen testified that reduction of oxygen content in a storage room to the level he recommended makes apples vulnerable to damage from cold temperature. Dr. Olsen ultimately concluded the discoloration which he observed was a function of storage of the apples at 31 degrees fahrenheit in 1.5% oxygen.

Dr. Olsen ruled out sunburn as an explanation for the damage. He said the discoloration which he observed occurred on all sides of the apple, which is inconsistent with sunburn.

According to Dr. Olsen, the only type of scald to which Golden Delicious apples are susceptible is senescent scald. That occurs when an orchardist waits too long to harvest the crop. Dr. Olsen said he reviewed the records regarding the 1989 harvest, and that the Golden Delicious apples had been picked at the proper time. Thus, he did not believe the damage was due to scald.

However, Dr. Olsen admitted his initial assessment had been different. He acknowledged his first impression had been that climatic conditions during the growing season were a significant factor.

After reviewing the evidence, the Court finds Dr. Olsen's assessment to be more persuasive. Not only did Dr. Olsen have more data upon which to base his opinion, but the data was more reliable than that provided to Dr. Patterson. Dr. Olsen went to the Okanogan plant in March, 1990, and observed Golden Delicious apples as they came out of storage. The insurance adjuster brought additional samples to him for inspection. Finally, Dr. Olsen was provided with the records of the condition of fruit at harvest.

The Court finds that the damage to Magi's apples is not attributable to sunburn, or any other climatic condition which occurred during harvest; nor is the injury a form of scald. The most plausible expla-

nation for the cause of the loss is that provided by Dr. Olsen. The Court therefore concludes the loss was a function of both "extremes of temperature" and "improper oxygen concentration."

(b) Since Magi has proved its loss is covered by the terms of the policy, the burden shifts to Underwriters to show the loss falls within one of the exclusions to coverage. *Texas Eastern Transmission Corp.,* 579 F.2d at 564; *Pillsbury Co.,* 705 F.Supp. at 1399; *Standard Structural Steel Co.,* 597 F.Supp. at 192.

▮▮▮▮ Endorsement No. 4 contains six separate exclusions to coverage, only one of which is at issue in this case. The policy does not provide coverage, according to paragraph "c", for:

> Sub-standard condition of agricultural produce placed in cold storage including, but not limited to, "bitter pit", "brown core", and "stem cavity browning", "boron deficiency cork", "cork spot", "drought spot", "internal breakdown", "internal browning", "Jonathan spot", "ordinary scald", "senescent scald", "superficial scald", "soft scald", "soggy breakdown", "water core", "black end", "boron deficiency pitting", "core breakdown" and "green stain".

Ordinarily, an exclusionary clause is "strictly construed against the insurer." *Union Fire Ins. v. Zuver,* 110 Wash.2d 207, 210, 750 P.2d 1247 (1988); *Rodriguez v. Williams,* 107 Wash.2d at 384, 729 P.2d 627. Since the insurance company drafts the language of the policy, it "is in a better position to prevent mistakes or ambiguities." *Continental Ins. Co. v. Paccar, Inc.,* 96 Wash.2d 160, 167, 634 P.2d 291 (1981). The rule also recognizes that an insured rarely has the ability or expertise to negotiate the terms of an insurance contract. *See generally Boeing v. Aetna Casualty & Surety Co.,* 113 Wash.2d 869, 904–05, 784 P.2d 507 (1990) (Callow, C.J., dissenting). Were exclusions not strictly construed against the insurance company, they might "unfairly devour the whole policy." *Riordan v. Commercial Travelers,* 11 Wash.App. 707, 711, 525 P.2d 804 (1974).

This case is atypical. The language of Endorsement No. 4 was provided by Magi's insurance broker. As a result, the considerations which would normally require strict construction of the exclusionary clause against Underwriters are less pressing. Because "rules of construction are not goals in themselves but only aids to interpretation," *Eurick v. Pemco Insurance*, 108 Wash.2d 338, 340–41, 738 P.2d 251 (1987), the Court declines to construe the exclusion strictly against Underwriters.

The parties disagree sharply regarding the scope of the exclusion. Underwriters maintain any apple which develops any of the above-named conditions is excluded from coverage. According to Underwriters, it makes no difference when the condition occurs. Magi, on the other hand, argues an apple is sub-standard within the meaning of the policy only if it is determined to be so at the time it is placed in storage.

Neither interpretation is unreasonable on its face; so the Court finds the exclusion is ambiguous with regard to the point in time at which an apple is determined to be sub-standard. *Utilities System v. PUD 1*, 112 Wash.2d 1, 11, 771 P.2d 701 (1989); *Kowal v. Grange Insurance*, 110 Wash.2d 239, 247, 751 P.2d 306 (1988); *E–Z Loader v. Travelers Indem. Co.*, 106 Wash.2d 901, 907, 726 P.2d 439 (1986). "When the parties' language is ambiguous, the principal goal of contractual construction is to enforce the parties' intent." *Greer v. Northwestern National Ins.*, 109 Wash.2d 191, 200, 743 P.2d 1244 (1987) (citations omitted); *Stender v. Twin City Foods, Inc.*, 82 Wash.2d 250, 254, 510 P.2d 221 (1973). Here, extrinsic evidence helps clarify the meaning of the exclusion. *Berg v. Hudesman*, 115 Wash.2d at 667, 801 P.2d 222.

Keith Anderson is the insurance broker who worked on Magi's behalf to obtain insurance coverage for its stored apples.[8] During the course of his career as a bro-ker, he has participated actively in the development of insurance coverage for agricultural products which are stored in warehouses such as Magi's. His testimony regarding the origin of the disputed exclusion is unrebutted.

According to Mr. Anderson's deposition, the language found in paragraph "c" was drafted a number of years ago at an earlier stage in the development of this form of coverage. Its purpose was to exclude from coverage that damage which could be attributed to inherent defects in harvested apples. In other words, insurance was to cover losses which occurred as a result of storage, not those which resulted from the manner in which the apples were grown or harvested.

The specific list of diseases and injuries included in the exclusion was taken from existing literature on the subject, and was apparently approved by a person whom Mr. Anderson believed to be an authority in the field. The list was designed to illustrate conditions which were necessarily the result of an inherent defect.

Not all defects are immediately apparent when harvested apples are placed in storage, a point upon which both Dr. Patterson and Dr. Olsen agreed. As noted above, apples which have suffered sunburn will be more susceptible to scald, though the condition will not appear, if at all, until after the apples have been placed in storage.

Since the exclusion was designed to eliminate coverage for apples which suffer from inherent defects, but at least some of the named diseases or injuries are not immediately apparent at harvest, it is unlikely the parties intended the exclusion to apply only to conditions which can be detected at the point the apples are placed in storage. It seems far more likely Underwriters' interpretation is correct. The policy does not cover a loss if, at any time after apples are placed in storage, they develop one of the named conditions.[9]

---

8. The Court agrees Mr. Anderson is Magi's agent, and acts as an advocate on its behalf. His testimony has been considered in light of that fact.

9. That conclusion finds some support in the fact both parties agreed a sensible warehouse operator would not knowingly store apples which suffered from any of the conditions listed in the exclusion.

■ To bring the exclusion to bear, Underwriters must prove Magi's apples were damaged as a result of a defect inherent in the apples when placed in storage, though the defect may not have been apparent at that time. Underwriters can satisfy that burden by showing the apples developed one of the conditions listed in subparagraph "c," though the list is not exclusive.

The Court concludes Underwriters failed to meet that burden. Underwriters argued the apples suffered from a form of scald. As explained above, the Court rejects that assessment of the damage. To the contrary, the Court is satisfied the loss is not attributable to any inherent defect in the apples.

Magi submitted a proof of loss which set its damage at Three Hundred Seventy-seven Thousand, One Hundred Dollars ($377,-100.00). That figure has not been challenged by Underwriters. Magi is entitled to recovery of that sum under the terms of the policy.

### 3. Consumer Protection Act

■ Magi has counterclaimed pursuant to RCW 19.86.090 alleging Underwriters violated Washington's Consumer Protection Act. To prove its counterclaim, Magi must satisfy a five-part test:

> Under this test, a private citizen must show (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes injury to the party in his business or property, and (5) which injury is causally linked to the unfair or deceptive act.

*Industrial Indem. Co. v. Kallevig*, 114 Wash.2d 907, 920–21, 792 P.2d 520 (1990) (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 784–85, 719 P.2d 531 (1986)).

"To date [the Washington Supreme Court has] recognized that consumers may establish the first element in two ways. They may show either that an act or practice 'has the capacity to deceive a substantial portion of the public,' or that 'the alleged act constitutes a per se unfair trade practice.'" *Saunders v. Lloyd's of London*, 113 Wash.2d 330, 344, 779 P.2d 249 (1989) (citing *Hangman Ridge*, 105 Wash.2d at 785–86, 719 P.2d 531). Here, Magi alleges solely that Underwriters have committed a "per se" violation.

RCW 48.30.010(2) authorizes Washington's Insurance Commissioner to promulgate administrative regulations which define methods, acts and practices which the Commissioner finds to be unfair or deceptive. The Commissioner has done so, listing nineteen separate types of conduct. WAC 284–30–330.

The gravamen of Magi's complaint is that Underwriters failed to respond promptly to the adjusters's recommendation, and then rejected it without good reason. Magi argues, that in doing so, Underwriters misrepresented "pertinent facts or insurance policy provisions," WAC 284–30–330(1); failed "to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies," WAC 284–30–330(2); refused "to pay claims without conducting a reasonable investigation," WAC 284–30–330(4); and compelled "insureds to institute or submit to litigation ... to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions...." WAC 284–30–330(7).

The Court has already held Underwriters' interpretation of the policy is incorrect, and that Magi's loss is covered. That holding does not, however, necessitate a ruling that Underwriters violated the administrative provisions cited by Magi. "Even if incorrect, a reasonable denial of coverage by the insurer is not a violation." *Gingrich v. Unigard Security Ins.*, 57 Wash. App. 424, 433, 788 P.2d 1096 (1990) (citing *Villella v. Public Employees Mut. Ins. Co.*, 106 Wash.2d 806, 821, 725 P.2d 957 (1986)). *See Felice v. St. Paul Fire & Marine Ins.*, 42 Wash.App. 352, 361, 711 P.2d 1066 (1985).

■ RCW 48.01.030 requires insurers to "be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters." Whether Underwriters acted in good faith depends upon

the reasonableness of its actions. *Saunders v. Lloyd's of London*, 113 Wash.2d at 345, 779 P.2d 249. "To establish a per se violation, however, [the Court] must find that [the insurer] had no reasonable justification for its conduct." *Starczewski v. Unigard Insurance*, 61 Wash.App. 267, 273, 810 P.2d 58 (1991).

Magi became aware that it faced significant loss to its stored Golden Delicious apples during February, 1990. By March 14, 1990, a notice of loss had been submitted. Underwriters retained the firm Maxson Young Associates, Inc., an independent adjuster, to evaluate the loss. A Mr. R.A. Porterfield was assigned to the case. He met with George Chapman at the Okanogan, Washington, facility on March 27, 1991. At that time, he photographed damaged apples. Mr. Porterfield did not reach a conclusion during coverage immediately; instead, he waited for Dr. Olsen to assess the cause of the damage. No later than April 3, 1990, Magi was informed that Mr. Porterfield's recommendation would depend upon Dr. Olsen's assessment.

Dr. Olsen submitted his analysis by letter dated April 24, 1991. It states, in part:

> It appears that climatic conditions this past season may have increased the sensitivity of Golden Delicious to a type of storage scald disorder. Some of the damage appears like delayed sunburn but a lot of it looks like scald and shows up on the yellower fruit after several months in storage.

(Ex. 512, p. 8).

In separate reports dated May 14, 1990, and June 12, 1990, Mr. Porterfield advised Underwriters he believed the policy covered the loss. George Chapman was informed of the recommendation through phone conversations, copies of correspondence, and at least one meeting with Mr. Porterfield.

Underwriters did not respond to Mr. Porterfield's recommendation until August, 1990. By letter of August 29, 1990, Magi was advised its claim was being denied due to a lack of fortuity.

There are three reasons why Underwriters' denial of the claim was not unreasonable. First, the precise requirements of the fortuity doctrine had yet to be established in Washington. Although Underwriters' proposed definition is contrary to existing authority from other jurisdictions, Underwriters could have believed the Washington Supreme Court would accept their argument regarding fortuity, and hold the loss was non-fortuitous.[10] Second, given Dr. Olsen's letter, Underwriters could reasonably have believed the loss was excluded from coverage. Dr. Olsen wrote "climatic conditions ... may have increased ... sensitivity ... to a type of storage scald disorder." He went on to say, "Some of the damage appears like delayed sunburn[,] but a lot of it looks like scald...." After studying the language of paragraph "c," a reasonable person could conclude the loss was excluded based upon Dr. Olsen's letter. Third, the delay in processing the claim was not unreasonable. Underwriters received notice of Mr. Porterfield's recommendation shortly after May 14, 1991. By August 29, 1990, word of the rejection of the claim was being sent to Magi. Given the ambiguities in the law and the insurance policy, the Court cannot say it was unreasonable for Underwriters to take three and one-half months to analyze the claim.

### 4. Equitable Estoppel

Magi contends it was led to believe its claim would be paid when Underwriters failed to respond promptly to the adjuster's recommendation. Magi argues it relied to its detriment on that recommendation when it made a partial payment to orchardists in anticipation of recovery, and that Under-

---

**10.** That does not mean this Court would have reached a different result if Underwriters' proposed definition had been accepted. In *Town of Tieton v. General Ins. Co.*, 61 Wash.2d 716, 717, 380 P.2d 127 (1963), a case upon which Underwriters place great weight, the Washington Supreme Court denied coverage because it believed the loss was foreseeable. Here, the loss was *not* foreseeable. The Court believes its ruling is consistent with the decision in *Town of Tieton.*

writers should be precluded from denying coverage. The issue which Magi has raised is one of equitable estoppel, which requires proof of three elements:

> (1) an admission, statement, or act inconsistent with the claim afterwards asserted, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act.

*Saunders v. Lloyd's of London,* 113 Wash.2d 330, 340, 779 P.2d 249 (1989) (quoting *McDaniels v. Carlson,* 108 Wash.2d 299, 308, 738 P.2d 254 (1987)).[11]

■ Magi is correct when it argues an adjuster's actions may create estoppel. *Buchanan v. Switzerland Gen. Ins.,* 76 Wash.2d 100, 108–09, 455 P.2d 344 (1969). However, at least three additional conditions must be met: First, Magi bears the burden of proving the adjuster had apparent authority to bind Underwriters. *Buchanan v. Switzerland Gen. Ins.,* 76 Wash.2d at 108–09, 455 P.2d 344. Second, the apparent authority of an agent may be inferred only from the acts and conduct of the principal. *Schoonover v. Carpet World,* 91 Wash.2d 173, 178, 588 P.2d 729 (1978); *Walker v. Pacific Mobile Homes, Inc.,* 68 Wash.2d 347, 350, 413 P.2d 3 (1966); *Lamb v. General Associates, Inc.,* 60 Wash.2d 623, 627, 374 P.2d 677 (1962); *Equico Lessors v. Tow,* 34 Wash.App. 333, 338, 661 P.2d 597 (1983). Third, Magi must prove its reliance upon the agent's apparent authority was reasonable. *Saunders,* 113 Wash.2d at 340–41, 779 P.2d 249 (citing *Leonard v. Washington Employers, Inc.,* 77 Wash.2d 271, 280–81, 461 P.2d 538 (1969)). *See Schoonover,* 91 Wash.2d at 179, 588 P.2d 729. Justifiable reliance may be proved by a showing that " 'a person exercising ordinary prudence, acting in good faith and conversant with business practices and customs, would [have been] misled, and such person has given due regard to such other circumstances as would cause a person of ordinary prudence to

make further inquiry.' " *Equico Lessors,* 34 Wash.App. at 338, 661 P.2d 597 (quoting Restatement (Second) of Agency § 8 (1958)).

■ Here, Magi has proved the adjuster was clothed with apparent authority to investigate the claim and make recommendations to the adjuster. Magi has failed to prove, however, that the adjuster's statements (even combined with Underwriters' delay) constitute a "statement ... inconsistent with the claim afterwards asserted."

Clearly, Mr. Porterfield had authority to investigate the claim. He was retained by Underwriters; he conducted an investigation on Underwriters' behalf; and he hired an accounting firm to quantify damage. There is no question but that Mr. Porterfield concluded the claim was covered by the policy; that he recommended payment of the claim by Underwriters; and that he communicated his conclusions and recommendations to Magi. But he never told Magi that Underwriters would, in fact, pay the claim. Throughout, he phrased his opinions as recommendations to Underwriters. Thus, his statements are distinguishable from those cases in which an estoppel has been found. *See, e.g., Schoonover,* 91 Wash.2d at 178–180, 588 P.2d 729 (principal was bound to pay wage claim where agent hired sales person and set the terms of compensation); *Walker,* 68 Wash.2d at 350–51, 413 P.2d 3 (salesman sold trailer); *Buchanan,* 76 Wash.2d at 109, 455 P.2d 344 (adjuster allegedly told owner he would file proof of loss); *Northside Auto v. Consumers Ins.,* 25 Wash.App. 486, 490–91, 607 P.2d 890 (1980) (adjuster told mechanic to make repairs).

Magi is a large business, with access to counsel. Faced with silence from Underwriters, Magi was certainly in a position to consult counsel for advice regarding the likelihood of recovery. Magi can hardly be heard to complain, therefore, that it was misled by Underwriters' silence. A reason-

---

**11.** In *Saunders,* estoppel was based exclusively upon the actions of the insurance company, not its agent. *Saunders,* 113 Wash.2d at 341–43, 779 P.2d 249. Here, by contrast, the existence of estoppel depends, in large part, on the adjuster's actions.

ably prudent person in Magi's position would not have been justified in concluding, from Mr. Porterfield's statements, that Underwriters would pay the claim. Consequently, the elements of estoppel have not been proved.

### 5. Prejudgment Interest

 The Court has previously determined Underwriters must pay Magi the amount set forth in the proof of loss, which is the sum of Three Hundred Seventy-seven Thousand, One Hundred Dollars ($377,-100.00). Magi also requests the Court to award prejudgment interest. *Prier v. Refrigeration Eng'g Co.*, 74 Wash.2d 25, 32, 442 P.2d 621 (1968), provides:

> The rule in Washington is that interest prior to judgment is allowable (1) when an amount claimed is "liquidated" or (2) when the amount of an "unliquidated" claim is for an amount due upon a specific contract for the payment of money and the amount due is determinable by computation with reference to a fixed standard contained in the contract, without reliance on opinion or discretion.

(Citations omitted.)[12] Although denying coverage under the terms of the policy, Underwriters have not disputed the accuracy of the proof of loss which Magi prepared.[13] Recourse to the proof of loss allows computation of Magi's claim "with exactness, without reliance on opinion or discretion." *Prier*, 74 Wash.2d at 32, 442 P.2d 621. Magi's claim is therefore "liquidated," which entitles Magi to prejudgment interest from the date the proof of loss was submitted.

### F. CONCLUSION

1. Underwriters request for a declaratory judgment stating the policy does not cover Magi's loss is DENIED.

2. Magi's counterclaim for judgment that the policy covers the loss is GRANTED in the amount of Three Hundred Seventy-seven Thousand, One Hundred Dollars ($377,100.00), with prejudgment interest from the date the proof of loss was submitted.

3. Magi's counterclaim for damages, attorney fees, and costs under Washington's Consumer Protection Act is DENIED.

IT IS SO ORDERED. The Clerk is hereby directed to file this Opinion, enter Judgment accordingly, and furnish copies to counsel.

---

12. The *Prier* rule continues to retain its vitality. *See, e.g., Hop Producers v. Goschie Farms,* 112 Wash.2d 694, 708–09, 773 P.2d 70 (1989); *Hansen v. Rothaus,* 107 Wash.2d 468, 472, 730 P.2d 662 (1986).

13. The Court notes the proof of loss was prepared under the direction of the adjuster, who received assistance from an accounting firm which had been approved by Underwriters.