**INSURANCE COMPANY OF NORTH AMERICA, Plaintiff,**

v.

**UNITED STATES GYPSUM COMPANY, Defendant.**

**UNITED STATES GYPSUM COMPANY, Plaintiff,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant.**

**Civ. A. Nos. 85–0075–A, 85–0149–A.**

United States District Court,
W.D. Virginia,
Abingdon Division.

Jan. 20, 1988.

Wade W. Massie, Abingdon, Va., Samuel P. Gerace, Richard B. Sandow, Pittsburgh, Pa., for Ins. Co. of North America.

Jackson S. White, Jr., Abingdon, Va., Stephen C. Neal, Kevin T. Van Wart, Christopher Mc Elroy, Chicago, Ill., for U.S. Gypsum.

GLEN M. WILLIAMS, District Judge.

This diversity case presents the novel issue of whether the subsidence of the earth beneath a gypsum processing plant was fortuitous. For the purposes of an "all risk" insurance policy, the court rules that the subsidence event was indeed fortuitous and denies the insurance company's motion for judgment notwithstanding the verdict.

### FINDINGS OF FACT

The parties in these cases include the United States Gypsum Company (USG) and the Insurance Company of North America (INA). USG is a Delaware corporation engaged in the mining of gypsum, a mineral used chiefly in the manufacture of gypsum board. As its name suggests, INA, a Pennsylvania corporation, is an insurer.

INA issued to USG an all-risk property insurance policy covering over 120 USG locations on June 1, 1983. This type of policy insures all risks of loss except for specifically excluded events. The policy did not exclude subsidence or mine-related perils. INA reinsured part of the policy with Industrial Risk Insurers (IRI), a company partially owned by INA, for any losses above $5 million. The policy contained a $250,000 deductible.

On November 4, 1984, the earth subsided beneath part of the Plasterco, Virginia facility where USG had a gypsum wallboard plant it had operated since the turn of the century. A large area collapsed causing a massive surface subsidence of up to six feet over an area of approximately twenty acres. Several large cave holes appeared that were as much as seventy-five feet deep and several hundred feet across. Buildings and power and water lines were damaged as well as portions of Highway 745 and the Norfolk and Western Railroad. USG presented evidence to show that it had spent approximately $34 million to repair the damage.

INA filed suit in this district, while USG filed suit in the United States District Court for the Northern District of Illinois. This court ordered the Illinois case transferred to Abingdon. The cases were consolidated for trial. The jury returned a verdict for USG in the amount of $24.8 million, the full amount it claimed, notwithstanding INA's various fraud and policy defenses. INA originally argued through a motion for summary judgment that the loss suffered by USG was nonfortuitous. Because numerous questions of fact pervaded the issue, the court denied the motion and heard the evidence as a trier of fact at the same time the other issues were presented to the jury. This opinion relates to the fortuity issue alone; other issues arising out of the jury trial will be considered in a separate opinion.

USG's Plasterco facility is located in Washington County. The surrounding area has been mined by various firms since

the nineteenth century. Prior to the November 4 subsidence, numerous cave-ins and natural sinkholes had occurred; at least forty holes have appeared since sometime before the year 1925. In the twenty-five year period leading up to the issuance of the insurance policy, there had been only eight such holes which had caused little or no property damage. The largest single loss prior to the great event of November 4 was in 1969, incurring less than $700 in damage.

After USG abandoned the mine in 1979, company officials sought the advice of several experts, including Dr. Nolan Aughenbagh and Dr. James Scott, to develop a program to reduce the risk of subsidence damage. The program consisted of three major efforts: measurement of surface subsidence, evaluation of failure, and reduction of the risk of subsidence. First, USG let the mine flood to the ninth level and began to scientifically measure surface subsidence through "Precise Level Monitoring." Along with contour mapping, this monitoring revealed steadily increasing rates of surface subsidence throughout the October 1980 to August 1984 time frame. The maximum amount of subsidence was 7.9 inches of movement with only 2.9 inches around the mill structure area. However, no damage was occurring. Second, USG scientifically measured mine failure through: visual inspections, borehole video camera studies, crack mapping, underground precise level surveying, crack gauges, inclinometers, electric distance measuring devices, lasers and prisms, roof convergence monitors and computer-enhanced three-dimensional graphics. Finally, USG reduced the risk of subsidence loss through continued monitoring and measuring of ground movement, controlling the water level, drilling holes and backfilling mine cavities which were considered the most dangerous. This was accomplished from the surface of the mine. USG also established a committee to meet twice a year to review the subsidence conditions.

The subsidence which occurred on November 4, 1984 was unique not only in the history of Plasterco but in the history of USG. The undisputed testimony in this case from all of USG's witnesses familiar with the mine was that they never expected subsidence of such magnitude. The subsidence measurements from USG's monitoring program revealed minimal movement and gave no grounds for concern. Even though there was an increase in the summer of 1984, USG's experts believed that the concentration was in an isolated area where a single cave hole existed known as the "grave hole" which had opened several times in the past.

The court finds that INA, at the time it issued the all-risk policy, knew it was insuring a company that had substantial mining operations and that subsidence was a risk of mining. INA did not conduct its own inspections of the more than 120 facilities USG sought to insure: instead, INA employed IRI to inspect a number of randomly selected facilities to assess risk of loss. One of these facilities was the Plasterco plant. No one disputes the evidence that in April 1983, IRI reviewed files containing subsidence information at both Plasterco and Fort Dodge, Iowa. IRI inspectors specifically reported the existence of abandoned mines at Fort Dodge and sink holes and damaged plant facilities in other areas. Yet, INA took no action in response to this information.

The parties do not dispute the evidence that USG had never had any subsidence loss greater than the $250,000 deductible. INA therefore insured USG only against catastrophic or substantial subsidence loss which is the kind of loss which is at issue in this case. In twenty five years prior to June 1, 1983, Plasterco had never experienced a subsidence loss that was anywhere near the level of the deductible in this case.

At the time INA issued its all-risk policy to USG, there was one of the most competitive market conditions ever to exist in the history of the insurance industry. Interest rates were soaring, inflation was high and insurance companies were anxious to invest their premiums and reserves to avail themselves of the high rate of return. As a result, insurance companies aggressively solicited and competed for business. At the time INA issued this policy, its under-

writing manuals provided that underwriters should carefully consider whether exclusions should be imposed to restrict coverage, and particularly where subsidence was the insured peril. Underwriting manuals stated that subsidence was an all-risk peril that may cause severe loss. These manuals also stated that, where a loss approached certainty, the policy should either exclude coverage or contain an appropriate deductible. The USG policy was consistent with the underwriting guidelines. Insurance witnesses in this case agreed that, with respect to all-risk policies, the insurance business considered a non-fortuitous loss to be one which was intended and expected from the standpoint of the insured.

## CONCLUSIONS OF LAW

### *Fortuitous Loss Defined*

 "All risk" insurance contracts are a type of insurance where the insurer agrees to cover all risks of loss except for certain excluded events. Courts in the United States have interpreted this type of insurance to exclude non-fortuitous losses. This unnamed exclusion is known as the fortuity doctrine. *See generally* S. Cozen and R. Bennett, *Fortuity: The Unnamed Exclusion,* XX Forum 222 (1985). The burden of proof is on the insured to prove the loss was fortuitous. *Morrison Grain Co., Inc. v. Utica Mutual Insurance Co.,* 632 F.2d 424, 429 (5th Cir.1980); *Texas Eastern Transmission Corp. v. Marine Office–Appelton and Cox Corp.,* 579 F.2d 561, 564 (10th Cir.1978). The burden is easily met, *Morrison,* 632 F.2d at 430, but in practice, not so easily overcome since few courts have held a loss to be non-fortuitous.

The fortuity doctrine was first developed in the marine insurance context after World War I. *British and Foreign Marine Insurance Co. v. Gaunt,* 2 A.C. 41 (1921); (water damage to wool carried on ship's deck was fortuitous) *Mellon v. Federal Insurance Co.,* 14 F.2d 997 (S.D.N.Y. 1926) (damage to ship's boiler which exploded was fortuitous but damage to cracked boiler was not fortuitous because apparently due to latent defect or wear and

tear). The underlying principle of the doctrine is public policy: it would encourage fraud to allow recovery on an insurance loss which is certain to occur. *Compagnie des Bauxites de Guinee v. Insurance Co. of North America,* 554 F.Supp. 1080, 1085 (W.D.Pa.), *rev'd* 724 F.2d 369 (3d Cir.1983). Through the years, the courts have recognized that there are losses which are certain to occur but uncertain as to time of occurrence. The most obvious example of this of course would be life insurance where the event of death is a certainty, but the timing of its occurrence is not. Fortuitous has been defined as "occurring by chance without evident causal need or relation or without deliberate intention." Webster's Third International Dictionary at 895 (1961). *See also* Black's Law Dictionary at 589 (5th ed. 1979). Throughout the years, the doctrine of fortuity has been refined to mean one which is dependent on chance insofar "as the parties to the contract are aware." *Restatement of Contracts* § 291, Comment (a) (1931). This rule of law defining fortuitous event was first enunciated without reference to the Restatement of Contracts. In 1962, in *Miller's Mutual Fire Insurance Co. v. Murrell,* 362 S.W.2d 868 (Tex.Civ.App.1962), the insured had damage to his dwelling when the earth beneath the house became swollen and expanded which in turn caused the walls and foundation of the house to buckle and collapse. All the expert testimony in the case demonstrated that the loss was certain to occur. The court nonetheless held that it was fortuitous in nature because even though everyone knew, from the day the house was built, that the earth would swell and expand, no one had any certain knowledge that the damage was inevitable. In other words, the parties themselves were not aware that the loss would occur at a particular time.

Some courts have found it helpful to interpret fortuitous as analogous to the insurance policy term "accident." In construing the word "accident," the emphasis focuses on the unplanned and unintentional nature of the damage rather than the fact that it is a physical certainty, or something

that is inevitable. Therefore, in considering whether or not a collapse of a tippler building and crusher house fell due to an unknown design defect, the court concluded that even though the loss was inevitable, it was clearly unplanned and unintentional. *Compagnie Des Bauxites de Guinee v. Insurance Company of North America,* 724 F.2d 369 (3rd Cir.1983). Here, we see the definition of fortuity becoming almost synonymous with accident. In fact, Black's Law Dictionary uses the words fortuity and accidental as synonymous. Thus, in *Essex House v. St. Paul Fire Marine Insurance Company,* 404 F.Supp. 978 (S.D.Oh.1975), the insurance company claimed that a face brick was bound to collapse within the policy time limits however, the witnesses for the defense were unable to state when it could be predicted with certainty the loss would occur. Therefore, the court found for the plaintiff.

In earlier days of the fortuity doctrine, losses which occurred from inherent defects in insured property or ordinary wear and tear were considered to be non-fortuitous. *E.g., Gaunt,* 2 A.C. at 57. Under recent standards, the focus has been on the awareness of the insured to the loss. Therefore, it has been held that an inherent defect unknown to the insured was nevertheless fortuitous. *Employers Casualty Co. v. Holm,* 393 S.W.2d 363 (Tex.Civ.App. 1965). Excessive wear and tear which was unknown to the insured has also been considered as fortuitous. *Redna Marine Corp. v. Poland,* 46 F.R.D. 81 (S.D.N.Y. 1969). This approach makes a loss fortuitous even if it is occasioned by the negligence of the insured, *Goodman v. Fireman's Fund Insurance Co.,* 600 F.2d 1040, 1042 (4th Cir.1979), unless there is an express exclusion to the contrary.

■ For purposes of this case, the court will consider that the doctrine of fortuity is adopted and is the law of the Commonwealth of Virginia. Although there are no Virginia cases directly on point, at least one Virginia federal court, in a marine insurance case, has recognized that a claimed loss must be fortuitous and must have occurred by chance beyond the ordinary exertions of human skill. *Capital Coastal Corp. v. Hartford Fire Insurance Corp.,* 378 F.Supp. 163 (E.D.Va.1974) (sinking of boat was not fortuitous but due to ordinary wear and tear). Also, since the definition of accident and definitions of fortuity are so closely aligned, the court finds support for the doctrine from prior Virginia cases on the definition of "accident." *See American Nat. Ins. Co. v. Dozier,* 172 Va. 376, 2 S.E.2d 282 (1939). (Evidence that welder died from inhaling "galvanize" fumes sufficient for jury to find death was accidental). In *Monterey Corp. v. Harp,* 216 Va. 843, 850, 224 S.E.2d 142, 147 (1976), a Virginia court defines accidental in the same manner as Black's Law Dictionary, to-wit: "happen by chance, or unexpectedly; taking place not according to the usual course of things; casual; fortuitous." In determining whether or not a loss is fortuitous, one must not look upon it on as a matter of hindsight. *Compagnie Des Bauxites,* 724 F.2d at 372. Furthermore, if the court finds that USG in this case was negligent, it is noteworthy that where the insured or its agent was negligent, this has been deemed to be fortuitous unless there was an express exclusion in an all-risk policy. *Goodman v. Fireman's Fund Insurance Co.,* 600 F.2d at 1042. The testimony of the expert witnesses in this case for both INA and USG testified that the standard for fortuity in the industry was determined from intended and expected actions from the standpoint of the insured.

### Was the Plasterco Loss Fortuitous?

■ Upon due consideration of the facts in this case and based upon the law as gleaned from the cases throughout the United States, the court believes that the Plasterco loss was a fortuitous event. All of the witnesses who testified on behalf of USG stated that they did not expect the occurrence of a loss of this magnitude. The testimony of the witnesses showed that the losses which have occurred in the past at Plasterco or other USG locations were minor property losses. Furthermore, the sinkholes which had occurred prior to the accident were located at places beyond

any areas where property was located. USG was monitoring and caring for the facility to prevent any catastrophic damage from occurring at any place where any plants were located. Certainly, a subsidence event was a risk at any USG location where mining had been ongoing. Indeed, subsidence is likely to occur on the earth above a mine but any resulting damage is at best a risk, not a certainty, especially where precautions are taken. Insurance companies do insure risks, and the subsidence damage in this case was just that—a risk.

There was no certainty that any subsidence was destined to occur or, in particular, that it was destined to occur within the time limits of the policy in issue. USG had adopted and implemented a rather costly program to reduce the risk of subsidence damage. All of the witnesses who testified in this case stated that the catastrophic subsidence which occurred on November 4, 1984 was unexpected. INA produced no witnesses who testified to the contrary. Until that day, no damage had ever occurred that would have given rise to a claim under INA's policy at Plasterco.

USG's conduct before the June 1, 1983 policy date is perhaps the strongest evidence that the firm did not expect a catastrophic subsidence of the earth at Plasterco. In 1978 and 1979, USG invested $12 million modernizing the plant, which tended to double production capacity. USG would not have invested such sums if it expected a major catastrophe. In the week prior to the subsidence, USG spent several thousands of dollars repairing a large portion of its parking lot, most of which was destroyed during the subsidence. November 1, 1984, two USG employees, including the mine superintendent, entered the mine to observe its condition. Certainly, they would not have risked their lives roaming around a mine that was expected to collapse. The event occurred on a Sunday with the plant in normal operation. Again, USG would not jeopardize the lives of a full shift of employees if it expected a catastrophe. USG did expect some movement in the limited area of the gravehold and cordoned off this area; yet, the earth actually subsided at the entire plant area, not just at the gravehold.

### INA's Risk Assessment

Of considerable significance in this case, which the court has not found in a reading of other cases relating to all-risk policies, is the manner in which INA carried out its duty to inspect. *See Mutual of Omaha Ins. Co. v. Echols*, 207 Va. 949, 956, 154 S.E.2d 169, 172 (1967). All of the evidence shows that INA inspected all of the files through its agent, IRI, before writing this policy. These files contained many examples showing minor subsidence losses but none were ever questioned. INA knew it was insuring a company that had substantial mining operations, but it never insisted on any inspections of its own. Instead, INA delegated this to IRI which also has a loss in this matter.

Throughout all the arguments which have been made to this court in this case, INA's attorneys have consistently argued to the court and jury that USG did not reveal "this" event or provide "that" item of information. However, under Virginia law, INA had a duty to make an inspection before issuing the policy. *Id.* It had the right to incorporate exclusions in the policy to account for high-risk exposure. INA should have monitored the facility to evaluate the accuracy of its risk assessment. However, the record is replete with other examples of mining operations, abandoned mines and subsidence risks of which INA was aware. For example, IRI inspectors had specifically reported the existence of abandoned mines at Fort Dodge and the formation of mine-related sinkholes that had damaged plant facilities. The inspectors reported those mines were in danger of developing more sinkholes. Despite this knowledge, INA and IRI chose not to make any additional inquiries nor to take any action to restrict coverage of the all-risk policy. The court can neither sympathize nor tolerate INA's silence in the face of the information which was in its possession. This court believes it is unreasonable to place all of the blame on USG.

Furthermore, the court finds that INA's own manuals cautioned its underwriters to be careful and to consider whether exclusions should be imposed. These underwriting manuals specifically mention subsidence as being an insured peril which is apt to cause a severe loss and should therefore be carefully evaluated. The negligence of IRI and INA's employees in making their inspections, knowing that they were covering subsidence, is inexcusable and amounts to gross negligence.

■ The equities of this case reveal that INA so carelessly issued this policy that it is a factor which the court should consider in deciding this issue. The all-risk policy produced from the parties' negotiations is wholly consistent with INA's then-existing policies and guidelines. Finally, this court would note that the USG policy had a substantial deductible of $250,000 which covered normal subsidence loss. Indeed, the $250,000 would have more than covered any loss ever suffered by USG. It is noteworthy that INA only insured USG for catastrophic or substantial subsidence loss which is precisely the kind of loss at issue here. If this is not the intended type of coverage that was to be furnished, INA was getting money from USG for nothing. This is exactly the type of loss that INA contracted to take care of.

### CONCLUSION

The court finds a non-fortuitous loss is one that must have been intended and expected from the standpoint of the insured. The facts in this case show that the loss suffered by USG at Plasterco was neither intended nor expected when viewed from the standpoint of USG or when viewed from the standpoint of anyone else, including a non-interested party. Therefore, the motion JNOV is denied.