(A) Moorhead must be isolated from any participation in these matters or any related matter;

(B) Moorhead must be screened from any contact with other firm attorneys concerning these matters;

(C) Moorhead must be denied access to documents and files related to these matters;

(D) all staff must be advised of the Moorhead's disqualification and of the screening methods;

(E) Moorhead's correspondence must be monitored to ensure that she does not receive any documents related to these matters;

(F) Moorhead must not share in any fees derived from representation in the actions; and

(G) All attorneys and employees, must submit affidavits swearing to the implementation of the screening methods, under oath.

ICAROM, PLC, Plaintiff,

v.

**HOWARD COUNTY, MARYLAND, Defendant.**

No. AMD 94–2414.

United States District Court, D. Maryland.

Oct. 20, 1997.

See also, 904 F.Supp. 454.

J. Marks Moore, III, Wilson, Elser, Moskowitz, Edelman & Dicker, Baltimore, MD, for Plaintiff.

Barbara M. Cook, Katherine L. Taylor, Louis P. Ruzzi, Howard Cnty. Office of Law, Ellicott City, MD, William F. Ryan, Jr., Albert J. Mezzanotte, Jr., Howard R. Feldman, Whiteford, Taylor & Preston, LLP, Baltimore, MD, for Defendant.

## MEMORANDUM

DAVIS, District Judge.

## I. INTRODUCTION

Jurisdiction over this insurance coverage declaratory judgment action is based upon diversity of citizenship, 28 U.S.C. § 1332, and the parties agree that Maryland law is controlling. Plaintiff, Icarom, PLC, a corporation formed under the laws of the Republic of Ireland, sued Howard County, Maryland, seeking a declaration that, under insurance Policy No. PY 220684 ("the Policy"), it has no duty to indemnify Howard County against a pending lawsuit, or as to any other claims arising from the off-site migration of pollutants and hazardous substances attendant to the County's operation of certain landfills. Icarom further seeks a declaration that it has no duty to indemnify the County for pollution damage to its own property.

Howard County, in turn, seeks declaratory relief to the effect, *inter alia,* that Icarom is obligated to indemnify it for all losses to its own property caused by pollutants and contaminants, including the costs of investigation, remediation and clean-up. The County also seeks a declaration that Icarom's obligation to indemnify it extends to the property of others for which it is legally liable.

Pending before the Court are Howard County's motion for partial summary judgment,[1] Icarom's motion for summary judgment, and Howard County's cross motion for summary judgment.[2] The parties have exhaustively briefed the issues presented, and a hearing has been held. For the reasons set forth below, I shall grant Icarom's motion in part, and deny it in part, and grant Howard County's motions in part, and deny them in

---

1. Howard County's motion for partial summary judgment seeks declaratory relief only with respect to Section I of the Policy.

2. Howard County's cross motion for summary judgment seeks a declaration of liability with respect to Sections I & II of the Policy.

part. A final judgment declaring the rights and liabilities of the parties shall be entered.

## II. FACTS

### A. The Landfills

Howard County owns three landfills located within the County—Carr's Mill, which operated from 1953 to 1977; New Cut, which operated from 1944 to 1979–80; and Alpha Ridge, which has been in operation since 1980. Each of the landfills has been used, at various times, for the dumping of trash and other refuse, including hazardous materials. At all three landfills, there is on-site contamination resulting from pollution and hazardous substances, as well as off-site migration of that contamination.

In October 1993, a lawsuit was filed by Clyde B. and Shirley W. Pendleton in the Circuit Court for Howard County ("the Pendleton suit"), against Howard County, alleging that the migration of pollutants and hazardous substances from the Alpha Ridge Landfill has contaminated their adjacent property and created a nuisance.[3] In addition, at least one other Howard County resident has filed a claim against the County for compensation for property damage allegedly resulting from the operation of the Alpha Ridge Landfill.

3. The Pendletons also assert an inverse condemnation claim.

4. The other markets Marsh stated that it intended to use were Affiliated FM Insurance Co., Safety Mutual Insurance Co., Western Employers Insurance Co., General Reinsurance Corp., Marinco, PENco and Hartford Insurance Co.

5. A Marsh representative, Ron Galloway, testified on deposition that the term "exclusive Marsh & McLennan facility" meant that Marsh was the only domestic broker who could approach ICI for an insurance quotation. Galloway Depo. at 11–12.

According to Icarom, this working relationship began in the early 1980's when individuals at Marsh and Bain Dawes developed a form of property and commercial general liability policy to market to municipalities located in North America. The policy was designed to combine both first party property insurance as well as liability insurance. Marsh agreed to market the policy in the United States while Bain Dawes agreed to place the coverage in the London insurance market. The policy was subsequently

### B. The Procurement of Policy No. PY 220684

The present insurance coverage dispute had its genesis when, in a March 1984 letter, Marsh & McLennan ("Marsh"), an insurance broker, responded to a letter from Howard County soliciting bids for its insurance coverage, by indicating that it would like to provide the County with an insurance proposal based upon its bid specifications. In the letter, Marsh also indicated that the Insurance Company of Ireland ("ICI"), Icarom's predecessor in interest, was one of several markets Marsh intended to use[4] and that the "ICI program … [was] an exclusive Marsh & McLennan facility."[5]

Shortly thereafter, Howard County issued a 50–plus page Bid Document, setting forth its desired insurance coverages. As requested, a copy of the Bid Document was furnished to Marsh. The Bid Document requested that coverage be on a "blanket basis" for all real and personal property of Howard County, wherever located, and also as to any property of others for which the County was legally liable. The Bid Document also called for separate liability coverage, with the scope of such coverage requested to be "as broad as possible."

As a domestic insurance broker, Marsh enlisted C.T. Bowring, a London insurance

designated the "Professional Package Policy," sometimes referred to as "PPP."

At some point, the Marsh and/or Bain Dawes brokers approached an ICI underwriter to determine whether ICI had any interest in underwriting these municipal risks. The ICI underwriter indicated ICI would be interested, and agreed to underwrite such risks on an individual basis as they were presented to ICI by Bain Dawes's brokers. The Bain Dawes brokers handling the PPP program eventually left Bain Dawes and affiliated with CT Bowring, another London broker, in approximately 1983.

As apparently is customary in the London insurance market, a typical insurance placement would begin with Marsh approaching a North American municipality and offering to submit a bid on its property and casualty insurance coverage. Marsh would then contact the Bain Dawes (later C.T. Bowring) brokers and request that they present the details of the risk to ICI for consideration. The brokers would comply by preparing a placing slip and presenting it to the ICI underwriter for review and agreement. Pl's Mem. in Supp. of Mot. for Summ. J., at 8.

broker and Marsh subsidiary, to obtain a quotation from ICI. Accordingly, ICI provided C.T. Bowring with a quotation, setting forth the terms and conditions under which it would be willing to insure Howard County. Thus, on May 18, 1984, C.T. Bowring forwarded a telex to Ron Galloway ("Galloway"), a Marsh account executive, setting forth ICI's terms and conditions. The second page of the telex indicated that Section II of the Policy was subject to a "Seepage & Pollution Clause (NMA 1685)." The "Industries, Seepage Pollution and Contamination Clause" NMA 1685 provides as follows:

This Insurance does not cover any liability for

(1) Personal Injury or Bodily Injury or loss of, damage to, or loss of use of property directly or indirectly caused by seepage, pollution or contamination, provided always that this paragraph (1) shall not apply to liability for Personal Injury or Bodily Injury or loss of or physical damage to or destruction of tangible property, or loss of use of such property damaged or destroyed, where such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance.

(2) The cost of removing, nullifying or cleaning-up seepage, polluting or contaminating substances unless the seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance.

(3) Fines, penalties, punitive or exemplary damages

This Clause shall not extend this Insurance to cover any liability which would not have been covered under the Insurance had this Clause not been attached.

The telex also indicated that the "full bid specifications [had been] seen." Pl's Suppl. Mem. in Supp. of Mot. for Summ. J., Exh. C1.

Marsh thereafter submitted its bid to Howard County.[6] By letters dated June 15 and 20, 1984, Howard County advised Marsh that it was awarded the County's contract of insurance. Marsh, in turn, notified ICI. C.T. Bowring prepared a "Placing Slip,"[7] which set forth information regarding the type of coverages, the premium, the duration and limits of coverage, and other specific conditions to be included in the policy wording to be subsequently issued. The Placing Slip was presented to the ICI underwriter, who, after making various changes to the document, initialed it. Then, on June 26, 1984, C.T. Bowring prepared and forwarded a "Cover Note"[8] to Marsh, summarizing the insurance coverage ICI had agreed to provide Howard County. Included in the Cover Note was an express reference to the inclusion of the Seepage and Pollution Clause (NMA 1685) in Section II of the Policy.

In a letter dated June 29, 1984, Galloway acknowledged that Howard County had appointed Marsh as its "brokers for property and casualty insurance" and thanked the County for allowing Marsh to "represent them for insurance purposes." Df's Mem. in Supp. of Cross Mot. for Summ. J., Exh. A4. On July 19, 1984, Marsh sent the Cover Note and a premium invoice for the first year of coverage to Thomas P. Murphy ("Murphy"), the insurance consultant for Howard County who coordinated the process leading to the County's being insured by ICI. After reviewing the Cover Note, Murphy forwarded it along with the premium invoice to the Coun-

---

**6.** Neither Howard County's nor Marsh's files contain a copy of the completed two-page bid form. *See* Df's Suppl. Mem. in Supp. of Mot. for Summ. J., Exh. E. Moreover, neither Galloway nor Howard County's insurance consultant, Thomas P. Murphy, recall what information was provided on that form.

**7.** According to Icarom, "[a] placing slip is the preliminary contractual agreement between an

insurer (in this case ICI) and the insured (in this case Howard County), by which the insurer agrees to insure the insured pursuant to the terms of a slip and a policy wording to be subsequently issued." Pl's Mem. in Supp. of Mot. for Summ. J., at 9.

**8.** A "Cover Note" is essentially an insurance binder. It is proof that the insurance coverage is in place. Galloway Depo. at 31–32.

ty for payment, which the County paid.[9] Subsequently, on July 16, 1985, Marsh sent Murphy the renewal premium invoice for the second year of coverage. Just prior to the annual renewal of coverage in July 1985, Marsh had prepared a brief summary of the renewal coverage and forwarded most of that summary to Becky Horvath, a County official. Included with the summary was the following language: *"Exceptions*—limited pollution endorsement per attachment." Pl's Suppl. Mem. in Supp. of Summ. J., Exh. S. In any event, Murphy forwarded the invoice and the County paid the renewal premiums.

It was not until January 1986, however, that Murphy received the actual Policy wording from Marsh.[10] Murphy ultimately forwarded the Policy to Howard County on December 5, 1986.[11] The Policy, however, was non-renewed effective July 1, 1986. According to Murphy, the reason for the non-renewal was that ICI had "second thoughts about the program that they and Marsh & McLennan had put together to sell to municipalities and educational institutions in North America and they weren't making any money on it and decided that they were going to discontinue writing that business." Murphy Depo. at 90–91.

Thus, the ongoing insurer/insured relationship between Howard County and ICI officially ceased until on or about December 22, 1993, at which time Howard County notified Icarom, as ICI's successor in interest, that it

had suffered damages as a result of the existence of hazardous substances at the Carr's Mill and New Cut landfills. Thereafter, on January 26, 1994, the County advised counsel for Icarom of the Pendleton suit.[12] Counsel for Icarom responded on June 8, 1994, by denying coverage for all of the County's claims except the Pendleton suit, the defense of which Icarom agreed to undertake, subject to a reservation of the right to deny coverage at a later time.

## III. STANDARDS FOR SUMMARY JUDGMENT

■   Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. *Id.* at 587, 106 S.Ct. at 1356. A fact is material

---

9. The policy provided limits of liability in the amount of $5,000,000 "Combined Single Limit each and every occurrence separately in respect of Sections 1 and 2." In addition, Section I of the policy had a $5,000 self-insured retention, and Section II had a $50,000 self-insured retention. The original three-year premium for the policy was $320,000, with one third to be paid annually. Df's Mem. in Supp. of Cross Mot. for Summ. J., Exh. A5.

10. Although the reasons for the substantial delay in issuance of the Policy are unclear, Icarom maintains that it was solely the responsibility of C.T. Bowring to prepare the Policy wording and submit it to ICI for approval. Pl's Mem. in Supp. of Summ. J., at 13.

11. In his deposition, Murphy's stated reason for not forwarding the Policy to Howard County sooner was that it did not conform to the insurance agreement entered into between Howard County and ICI. He did not testify, however, as

to what specific language or terms were not in accordance with what he believed was negotiated. Murphy did testify that he had several discussions with Ilish Donnelly, a Marsh representative, on this issue. According to Murphy, Marsh was supposed to get back to him regarding the non-conforming language. He claims that Marsh never got back to him. Moreover, he admits that he failed to take any follow-up action in this regard. Murphy Depo. at 108–17.

12. In a letter sent to counsel for Icarom on May 6, 1994, Howard County stated that the estimated cost to date to clean up and remediate the Alpha Ridge site was $17 million; the estimated cost to clean up and remediate the Carr's Mill site was $6 million; and the estimated cost to clean up and remediate the New Cut landfill site was $12 million. Pl's Mem. in Supp. of Mot. for Summ. J., Exh. 9.

for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991).

■ A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11. The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). *See O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir. 1995), *rev'd on other grounds,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Shealy,* 929 F.2d at 1012.

■ When, as in the instant case, both parties file motions for summary judgment, the court applies the same standard of review. *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991); *ITCO Corp. v. Michelin Tire Corp., Commercial Division,* 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve genuine disputes of material fact on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). Rather, the role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Management Corp. v. Hartford Accident & Indem. Co.,* 627 F.Supp. 170, 172 (D.Md.1985) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure:* Civil 2d § 2720).

## IV. ANALYSIS

### A. Section I Claims

(i)

As an initial matter, Howard County claims that Section I Coverage A of the Policy, which covers "[a]ll risks of physical loss or damage ... on all real and personal property of every kind and description," is not subject to the "Industries, Seepage, Pollution and Contamination Clause" NMA 1685. Because Icarom concedes this point, I need not address it further. Accordingly, Howard County is entitled to judgment as a matter of law on this issue.

(ii)

■ Howard County next contends that Section I Coverage A extends to the property of landowners neighboring the landfills for which it may be liable for injuries caused by escaping pollutants and contaminants. In asserting this claim, Howard County focuses on language found in Section I, Definitions. That language provides as follows:

1) *PROPERTY OF THE NAMED INSURED*

The term "Named Assured's Property" shall mean All Real and Personal Property of the Named Assured, *Property of others for which the Named Assured is legally liable or under obligation to insure,* Personal Property of employees while at Named Assured's owned or operated Locations, Property during the course of construction or renovation and Named Assured's interest in Improvements and Betterments.

Pl's Mem. in Supp. of Summ. J., Exh. 4 (emphasis added).

The gravamen of the County's argument is that because there is no exclusion under Section I of the Policy for third party proper-

ty, it should be covered. It further argues that the nature of an "all-risks" policy is such that it should be given as expansive a definition as possible, "so as to provide coverage for all risks which are not expressly excluded." Df's Suppl. Mem. in Supp. of Summ. J., at 47, citing *Insurance Co. of N. Am. v. U.S. Gypsum Co.,* 678 F.Supp. 138, 139–41 (W.D.Va.1988), *aff'd,* 870 F.2d 148 (4th Cir. 1989).

Put simply, this argument is specious. While, at first blush, it appears that the language at issue supports such a conclusion, as Icarom points out, the sectional structure of the Policy and its attendant coverages dictate a different result. Howard County purchased a so-called "package" policy from ICI, which allowed it to satisfy its various coverage needs (i.e. property, liability, automobile) under one policy. Section I of the Policy provided property coverage, both real and personal, on an "all-risks" basis, while Section II provided, *inter alia,* "comprehensive general liability" coverage. Indeed, comprehensive general liability coverage is specifically designed to provide third party liability coverage. *See Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 783, 625 A.2d 1021, 1033 (1993) ("A hallmark of the comprehensive general liability policy is that it insures against injury done to a third party's property...."). Thus, in arguing that the same third party liability coverage is provided under Sections I and II of the Policy, Howard County attempts to blur the substantial distinction between the two.

■ It is clear, both contextually and logically, as Icarom points out, that Section I coverage which refers to "property of others for which the named insured is legally liable or under an obligation to insure" is intended to cover property leased, borrowed or rented by the County, or property otherwise in its care, custody or control. To be sure, to interpret Section I coverage as expansively as the County suggests would effectively render Section II's third party liability coverage "redundant and unnecessary." Pl's Mem. in Opp. to Df's Cross Mot. for Summ. J., at 28. Moreover, while it is true that an "all risks" policy is designed to extend broad coverage, it is equally true that, "under Maryland law,

a court should avoid reading a contract in a way that produces an absurd result, especially when a reasonable interpretation is available." *Catalina Enterprises v. Hartford Fire Ins. Co.,* 67 F.3d 63, 66 (4th Cir.1995); *see also Intermetal Mexicana v. Insurance Co. of North America,* 866 F.2d 71, 75 (3rd Cir.1989) ("The term 'all-risk' has been said to be 'somewhat misleading.' 'All-risk' is not synonymous with 'all loss.' ") (citation omitted).

With respect to Howard County's claim that there is no exclusion in the Policy prohibiting the interpretation it advances, it is most assuredly the case, as Icarom notes, that "it is not necessary to specifically exclude such an interpretation ... because the scope of the Policy is readily discernable by its language and sectional structure." Pl's Mem. in Opp. to Df's Cross Mot. for Summ. J., at 28. In sum, maintaining that third party liability coverage is available under Section I of the Policy is little more than the County's thinly-veiled attempt to circumvent the pollution exclusion clause it must confront under Section II. Accordingly, the County's motion for summary judgment shall be denied as to this claim.

(iii)

■ In its motion for summary judgment, Icarom contends that "land" is specifically excluded under Section I of the Policy. Consequently, Icarom submits that, to the extent that Howard County's land has been damaged by pollution from the landfills, it is excluded from coverage. In this regard, Icarom relies on the Policy language which states:

*PROPERTY EXCLUDED FROM COVERAGE HEREUNDER:*

1) Aircraft, watercraft, jewellery [sic], precious stones, furs or garments trimmed with fur, standing timber, growing crops, flora, fauna, roads, pavements and *land.*

Pl's Mem. in Supp. of Summ. J., Exh. 4 (emphasis added). In addition, Icarom notes, and indeed Howard County concedes, that a real property owner has a "bundle of different interests in its real estate, far

greater than just the land." Pl's Mem. in Opp. to Df's Cross Mot. for Summ. J., at 26; Df's Mem. in Supp. of Cross Mot. for Summ. J., at 13. Thus, Icarom maintains that the land exclusion is not in conflict with the agreement to insure real property. *See Horning Wire Corp. v. Home Indem. Co.*, 8 F.3d 587, 589–90 (7th Cir.1993) ("[L]and is merely a subset (though admittedly a big one) of the broader category of real property. Real property includes 'interests in things attached to land as well as land itself.'") (quoting Roger A. Cunningham et al., *The Law of Property* § 14, at 13 (1984)).

■ It is well settled that an "insurance policy which insures against 'all-risks' protects the insured against loss of or damage to the latter's property *except* as to the perils and risks excepted specifically from coverage in the contract itself." *Arcon Corp. v. Liberty Mut. Ins. Co.*, 591 F.Supp. 15, 21 (M.D.Tenn.1983), citing *Clay v. Sun Ins. Office, Ltd.*, 363 U.S. 207, 214, 80 S.Ct. 1222, 1227, 4 L.Ed.2d 1170 (1960) (dissenting opinion). Thus, as noted above, "all-risks" is not synonymous with "all loss." *Intermetal*, 866 F.2d at 75. In the instant case, the Policy language clearly and unambiguously excludes land from coverage. For its part, however, Howard County contends that it did not agree in writing that the coverage it specifically requested in the Bid Document could be modified by a land exclusion. This argument lacks merit even if the Court were to find that the Bid Document governs construction of the Policy.[13] Specifically, as Icarom points out, Howard County did not request "all-risks" coverage in the Bid Document. *See* Murphy Depo. at 65–66. Rather, with respect to real and personal property, Howard County stated that "[p]roposals and quotations are requested on a *blanket basis ... on as broad a basis of perils as possible.*"[14] Df's Mem. in Supp. of Mot. for Summ. J.,

Exh. A1 (emphasis added). Thus, to provide Howard County "all-risks" coverage by judicial declaration would be to afford it broader coverage than it specifically requested. It follows, therefore, that exclusions to the broader coverage are not violative of the terms of the Bid Document.

Significantly, the Bid Document does not specifically address the issue of exclusions, with respect to land or otherwise. As such, a land exclusion does not conflict with the terms of the Bid Document. Surely, Howard County did not expect, nor does it argue that it expected, an "all risks" policy with no exclusions, which would, in effect, amount to an "all loss" policy. Indeed, Howard County makes it clear that it understood that no "all risks" policy is without exclusions in conceding: "Section I of the Policy provides coverage for 'All Real and Personal Property of [Howard County], [and for] Property of others for which [Howard County] is legally liable....' This type of broad coverage, commonly known as 'all risks' coverage, insures against all risks of loss except those that are specifically excluded by the policy." Df's Mem. in Supp. of Cross Mot. for Summ. J., at 16–17.

Howard County also claims that, assuming *arguendo*, Icarom's argument with respect to the land exclusion prevails, that exclusion does not encompass groundwater. And, as the County points out, there has been substantial pollution damage to the groundwater at the landfills. Icarom wisely concedes this point. It submits only that to the extent land was damaged, it is not covered. Icarom is correct in this regard and is, therefore, entitled to summary judgment on this issue.

(iv)

Icarom also argues that Section I Coverage A of the Policy does not cover Howard County's deliberate dumping of pollutants at

---

13. As will be discussed *infra*, Howard County claims that the coverages described in the Policy "are effective only to the extent that they do not conflict with those which are specified in the Bid Document." (footnote omitted). Df's Suppl. Mem. in Supp. of Summ. J., at 2.

14. Blanket coverage has been defined as follows:
When a single face amount of the policy applies to either two or more locations, two or

more types of property, or a combination of locations and types of property, the contract is called blanket. For example, blanket policies frequently are written to cover goods stored at several locations when the total values involved are nearly constant although the value at individual locations may fluctuate widely. Robert I. Mehr, et al., *Principles of Insurance*, 207 (8th ed., 1985).

its own property, namely the three landfills. Pl's Mem. in Supp. of Summ. J., at 25. In this regard, Icarom claims that "all-risks" insurance covers only those losses of a "fortuitous," "accidental" nature, citing, *inter alia, Compagnie des Bauxites v. Insurance Co. of North America,* 724 F.2d 369, 372 (3rd Cir.1983) (stating that "accident" is a synonym for "fortuitous event"); *U.S. Gypsum Co.,* 678 F.Supp. at 141 ("Some courts have found it helpful to interpret fortuitous as analogous to the insurance policy term 'accident.' In construing the word 'accident,' the emphasis focuses on the unplanned and unintentional nature of the damage rather than the fact that it is a physical certainty, or something that is inevitable."); *Avis v. Hartford Fire Ins. Co.,* 283 N.C. 142, 195 S.E.2d 545, 548 (1973) (holding that all risks coverage extends only when the loss is fortuitous).

According to Icarom, because Howard County intentionally dumped vast quantities of various kinds of waste over an extended number of years at its landfills and "[i]mplicit in the composition of waste is the possibility that the refuse will contain pollutants of some sort," the dumping clearly was not an accidental, fortuitous occurrence. Pl's Mem. in Supp. of Summ. J., at 28 (footnote omitted). Moreover, Icarom maintains that it was reasonably foreseeable "at least as early as the 1980's" that the continuous dumping of a variety of wastes at the site would lead to the current pollution damage. Pl's Mem. in Opp. to Df's Cross Mot. for Summ. J., at 23.

Along these lines, Icarom points to the fact that the New Cut landfill was placed on the Open Dump Inventory Report in 1980, by the EPA, which claimed it was not in compliance with its "Disease Gases & Fire—Safety" criteria.[15] Icarom also notes that New Cut was temporarily placed on the Comprehensive Environmental Response, Compensation and Liability Act List ("CERCLIST") in 1982 for waste dumped at the landfill by Diamond Shamrock, a laundry and dry cleaning chemical manufacturing company located in Baltimore.[16]

With respect to the Carr's Mill landfill, Icarom points out that in 1976, County officials discovered illegal dumping of industrial waste at the site. Investigation of the incident indicated that the landfill superintendent, Sonny Bohager, facilitated many of the dumpings. Other County employees were also implicated. Howard County subsequently was cited by the Department of Natural Resources ("DNR") for a pollution violation in accepting the drums, and for potential problems to groundwater resulting from the buried drums. The County removed 15 exposed drums, but on the advice of and with the consent of the DNR, did not remove the remaining drums.[17] Finally, as to the Alpha Ridge Landfill, Icarom maintains that, in 1978, when the site was being planned, Howard County was aware of the dangers associated with landfilling as a waste disposal technique, namely the resulting, yet unavoidable byproducts of methane gas and leachate.[18]

15. James Irvin, Howard County's Director of Public Works, testified that, after inspection, the County was removed from the EPA's list. Irvin Depo. at 25–26.

16. Although New Cut was briefly placed on the CERCLIST, Icarom acknowledges that the EPA found no evidence that large amounts of hazardous substances from Diamond Shamrock had been dumped at the site. The EPA ordered no clean-up, and after an investigation, removed New Cut from the CERCLIST. Pl's Mem. in Reply to Df's Cross Mot. for Summ. J., at 20, n. 14.

17. At the time, the County's representative argued that while the 15 exposed drums should be removed, the remaining buried drums should not be removed

  *because of the danger of pollution damage if they were.* DNR representatives agreed and an

order was issued requiring the County to cap the area to minimize the likelihood of contaminants getting into ground and surface waters, to grade the area to improve drainage, and to remove any drums that could be removed during the capping process. Correspondence in October 1976 indicates that DNR visited the site and concluded that the County had complied with the Order. Pl's Suppl. Mem. in Supp. of Mot. for Summ. J., Exh. 10 (emphasis added).

  Carr's Mill closed in 1977; nevertheless, subsequent groundwater testing revealed the presence of contaminants. Therefore, in October 1993, the County began removing the buried drums. By March 1995, a total of 893 drums had been removed. *Id.*

18. Formerly, landfills operated as "open pit" dumps such that refuse was simply dumped into an open hole until it reached a certain height. At that point, the trash was burned down so that

In response, Howard County claims that "Maryland state 'courts have never determined that the judicially-created fortuity exclusion applies to all risks coverages governed by Maryland law." [19] Df's Mem. in Supp. of Cross Mot. for Summ. J., at 17. Yet, in its motion for partial summary judgment, the County itself asserts that the fortuity applies in the case *sub judice* when it states, " '[i]t has generally been recognized that a policy of insurance insuring property against 'all risks' creates a special type of insurance extending to risks not usually contemplated, and that recovery under the policy will generally be allowed for *all losses of a fortuitous nature*, in the absence of fraud or other intentional misconduct of the insured.' " Df's Mem. in Supp. of Mot. for Part. Summ. J., at 5 (quoting *All Risk Insurance—Design Flaws*, 41 A.L.R. 4th 1096 (1985)). Nevertheless, despite this glaring contradiction in Howard County's own argument, there is essentially no disagreement among the parties that for a loss to be covered under an all risks policy, the loss must be unplanned and unintentional, and not in the insured's foresight or expectation.

Correspondingly, while it is true that Maryland's appellate courts have not addressed the fortuity requirement in the context of an all-risks policy, they have construed the term "accident" from the perspective of an unplanned and unintentional loss.[20] *See, e.g., Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 652, 679 A.2d 540, 548 (1996) (holding that "an 'accident' under a liability insurance policy [occurs] when the resulting damage

was 'an event that takes place without [the insured's] foresight or expectation.' ") (quoting *Harleysville Mut. Cas. Co. v. Harris & Brooks, Inc.*, 248 Md. 148, 154, 235 A.2d 556, 559 (1967)). *See also Consumers Life Ins. Co. v. Smith*, 86 Md.App. 570, 579–80, 587 A.2d 1119, 1124–25 (1991); *Allstate Ins. Co. v. Sparks*, 63 Md.App. 738, 742–43, 493 A.2d 1110, 1112–13 (1985).

■ Howard County does not dispute that, as a municipality, and in accordance with applicable state and federal laws, it intended to operate its landfills, which necessarily entailed depositing waste and refuse at the sites. The County hastens to add, however, that there is a fundamental distinction between the operation of a landfill and the expectation of or intent to cause harm to its property or that of third parties.

In this respect, Howard County is correct. Icarom makes much of the fact that Howard County became aware that normal landfill operations would result in the production of leachate and/or methane gas. Yet, the record also reflects that the County took active steps to curtail any pollution damage resulting from these byproducts, including the institution of state-approved "capping" techniques at Carr's Mill in 1976 to prevent groundwater contamination from the buried drums, and the installation of a so-called "grout barrier curtain" at the New Cut landfill in 1977, designed to prevent the migration of methane gas to neighboring properties. Finally, with respect to Alpha Ridge, the evidence reflects that the landfill was specifi-

---

the pit could be filled up again. Irvin Depo. at 19–20. "Landfilling," by contrast, involves covering the waste with soil. Methane gas, which has both explosive and hazardous properties, is a byproduct of the decomposition process of the covered waste. *Id.* at 26–27. Leachate, on the other hand, is a chemical compound produced by rain filtering through the contents of a landfill. Df's Suppl. Mem. in Supp. of Summ. J., at 42.

**19.** Howard County also argues that there is no language in the Bid Document or the Policy which requires that a loss must be fortuitous. Here, the County misses the point. The exclusion is, by its nature, not listed in an all-risks policy. Rather, "[i]n addition to the exclusions named in the policy itself, 'every all-risk contract of insurance contains an unnamed exclusion—

the loss must be *fortuitous* in nature.' " *Intermetal Mexicana v. Insurance Co. of North America*, 866 F.2d 71, 74–75 (3rd Cir.1989) (quoting Cozen & Bennett, Fortuity: The Unnamed Exclusion, XX Forum 222, 223 (Winter 1985)) (emphasis in original). *See also Insurance Co. of North America v. U.S. Gypsum*, 678 F.Supp. 138, 141 (W.D.Va.1988), *aff'd*, 870 F.2d 148 (4th Cir.1989) (same).

**20.** Judge Northrop stated, in *Johnson & Towers Baltimore, Inc. v. Vessel "Hunter"*, 802 F.Supp. 1343, 1351 (D.Md.1992), in the context of a marine general liability insurance policy, that all risks coverage should be afforded to losses that are "fortuitous," citing *Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042 (4th Cir. 1979) ("all risks policies have been construed as covering all losses that are 'fortuitous' ").

cally designed to prevent possible pollution from leachate and methane gas.[21] *See* Irvin Aff., Df's Suppl. Mem. in Supp. of Cross Mot. for Summ. J., Exh. F.

In effect, Icarom claims, with the benefit of hindsight, that Howard County expected and/or intended the pollution damage that occurred. Thus, its losses are neither fortuitous, nor accidental. Such a determination, however, is to be made based on the actual awareness of the insured at the time the coverage was obtained. *See, e.g., Compagnie des Bauxites,* 724 F.2d at 372 ("We think it inappropriate to cause the insured to suffer a forfeiture by concluding, with the aid of hindsight, that no fortuitous loss occurred, when at the time the insurance took effect only a risk was involved as far as the parties were aware."); *Underwriters Subscribing . to Lloyd's Ins. v. Magi, Inc.,* 790 F.Supp. 1043, 1048 (E.D.Wash.1991) ("Some courts have been inclined to determine fortuity based upon the knowledge gained from hindsight. The modem rule rejects that approach.") (citations omitted). *See also U.S. Gypsum,* 870 F.2d at 152 ("[T]here is a fundamental distinction between the certainty of subsidence [from mining operations] and the certainty of resulting loss."); *City of Johnstown, New York v. Bankers Standard Ins. Co.,* 877 F.2d 1146, 1150 (2d Cir.1989) ("It is not enough that an insured was warned that damages might ensue from its actions, or that, once warned, an insured decided to take a calculated risk and proceed as before. Recovery will be barred only if the insured intended the damages, or it can be said that the damages were, in a broader sense, "intended" by the insured because the insured knew that the damages would flow directly and immediately from its intentional act.") (citations omitted).

While Howard County admittedly knew of the *dangers* associated with the pollutants and contaminants present in its landfills, it simply does not follow that it intended, expected or foresaw that pollution *damage* ultimately would occur. Rather, consistent with then-current industry practices, the record reflects that the County made concerted efforts to prevent any such occurrences.[22] In sum, it is clear that the pollution damage to the County's property was of a fortuitous, accidental nature.

■ Whether the fortuitous, accidental nature of Howard County's losses thereby entitles it to indemnification for the pollution damage to its property, *i.e.* groundwater, is another matter, however, and one which I decline to address, consistent with this court's discretionary authority in respect to declaratory judgment actions. *See, e.g., Wilton v. Seven Falls Co.,* 515 U.S. 277, 280–82, 115 S.Ct. 2137, 2140, 132 L.Ed.2d 214 (1995); *White v. National Union Fire Ins. Co.,* 913 F.2d 165, 167 (4th Cir.1990). Correspondingly, the parties openly admitted at the summary judgment hearing that they had failed to address adequately the occurrence issue, specifically, whether the pollution damage at issue "occurred" during the policy period. Indeed, the summary judgment record in this case is bereft of evidence, in the form of expert testimony or otherwise, that would allow the Court to grant summary, declaratory relief in this regard. Moreover, because this issue is so integrally related to the underlying state tort claims out of which this case arises, state court is the appropriate forum for resolution of this issue.

### B. Section II Claims

■ Turning to Section II Coverage H, which provides Comprehensive General Liability coverage, the threshold issue is wheth-

---

**21.** The 1978 "Operating Plan and Procedures for the Alpha Ridge Solid Waste Management Center" did acknowledge, however, that "approximately 5% of the dry weight of the landfill refuse *may* ultimately leach out of the fill." Pl's Suppl. Mem. in Supp. of Summ. J., Exh. 13 (emphasis added).

**22.** This point is clearly expressed by James Irvin, Howard County's Director of Public Works:

[T]he thought process of how you handled disposal practices are a lot different nowadays and this is the whole issue of how you treat VOC [volatile organic compounds]. It's not something that you would do today. It's handled much differently today because of the nature of how VOC migrates through the ground, so back then, this was not anticipated to be a problem if you capped it properly. That was sort of the prevailing practice then. Irvin Depo. at 46–47.

er the pollution exclusion is a part of the Policy. If, indeed, the pollution exclusion applies, the secondary issue is, of course, whether, the pollution damage in question was caused by a "sudden, unintended and unexpected happening during the [policy period]," as stated in the exclusion itself. Pl's Mem. in Supp. of Summ. J., Exh. 4.

Howard County claims that the coverages described in the Policy, and its attendant exclusions, apply only to the extent that they do not conflict with the terms and conditions specified in the Bid Document. Yet, even assuming this Court were to find that the Bid Document controls, there is, nevertheless, ample evidence suggesting that the pollution exclusion still applies. Specifically, while the Bid Document requests that liability coverage be "as broad as possible," this language does not connote that there can be no exclusions, or more precisely, no pollution exclusion. While the County *interprets* that phrase as prohibiting a pollution exclusion, such a meaning is not self-evident, as Murphy conceded at his deposition:

Q. Is there any language in this section [of the Bid Document] that prohibits the inclusion of a pollution exclusion clause in whatever insurance coverage was going to be provided by whatever insurance coverage was going to be provided by whatever insurer was awarded the bid?

\* \* \*

A. Prohibits, is there any wording that would prohibit that?

Q. Correct

A. My interpretation of the words as broad as possible would in fact prohibit that.

Q. It doesn't—there is no express prohibition in this wording anywhere is there?

A. Expressed prohibition of that? No.

Murphy Depo. at 66–67. Indeed, Howard County has failed to offer any other evidence, besides Murphy's testimony as to his interpretation, to support its position that the phrase "as broad as possible" effectively prohibited a pollution exclusion.

To be sure, the Bid Document is poorly drafted. Moreover, as Icarom points out, the very language of the Bid Document suggests that it does not require strict adherence to its terms. Accordingly, paragraph 6 of the General Conditions section provides:

6. EXCEPTIONS: The submissions of a bid shall be considered an agreement to all the terms, conditions, and specifications provided herein and in the various bid documents, *unless specifically noted otherwise in the proposal.*

Similarly, the Special Note to the General Provisions provides:

*SPECIAL NOTE:*

This Request for Proposals/Quotations and Underwriting Submission has been purposely drawn to allow for the *exercise of initiative and imagination on the part of potential proposers.*

Proposers should not consider any aspect of this submission to be a technical requirement that would prevent them from submitting a proposal and quotation. *All aspects of the proposals solicited herewith are negotiable* and proposers are encouraged to employ any legitimate means to fulfill the County's general requirements.

Df's Mem. in Supp. of Cross Mot. for Summ. J., Exh. A (emphasis added). Tellingly, Howard County fails to address satisfactorily this apparent contradiction in terms. While the County quotes Murphy's deposition testimony in which he stated, *"perhaps* a negotiation *might* ensue over the terms of bid proposals at variance with the Bid Document," *id.* at 21 (quoting Murphy Depo. at 61–62) (emphasis added), this statement makes it clear that a negotiation was not a necessary prerequisite to a bid proposal with varying terms.

Moreover, the record reflects that, at the time the binder of insurance was issued, in the form of the Cover Note, Murphy, who had been in the insurance business for many years, and on whose expertise the County relied in purchasing its coverage, failed to voice concern over the pollution clause. Murphy admits receiving and reviewing the Cover Note, which set forth the coverages under Section I and II of the Policy and which listed as one of the "Conditions" of

coverage "Section 2—Seepage and Pollution Clause (NMA 1685)." Df's Mem. in Supp. of Cross Mot. for Summ. J., Exh. A5. Nevertheless, Murphy stated that he thought the Cover Note was simply follow-up paperwork, or "wallpaper," as he termed it. Murphy Depo. at 102–05. He further stated that he had no understanding of what the reference to the pollution clause was, and made no attempt to find out.[23]

Yet, even a cursory examination of the first page of the Cover Note reveals that its description as mere "wallpaper" is off the mark. It provides, in pertinent part:

> Please examine this document *carefully* and *advise us immediately* if it is *incorrect* or *does not meet your requirements.*

> In accordance with your instructions we have arranged *cover as follows:*

Df's Mem. in Supp. of Cross Mot. for Summ. J., Exh. A5. Significantly, and as Icarom points out, after admittedly reviewing the Cover Note, Murphy sent it, along with the accompanying invoice, to Howard County, stating that the Note was "confirming the coverage." Pl's Suppl. Mem. in Supp. of Summ. J., Exh. M. Thus, at a minimum, Murphy's actions reflect an understanding of the legal and practical import of the Cover Note.

Without question, Icarom consistently communicated, in writing, the scope of coverage it was willing to provide, namely by way of the May 1984 telex from C.T. Bowring to Marsh, by way of the June 1984 Placing Slip detailing the coverage to be obtained, by way of the June 1984 Cover Note, and finally by way of the Policy itself.[24] More importantly,

all four documents referenced the pollution clause. Howard County cannot negate this unconverted evidence by claiming that certain boilerplate language appended to the Bid Document under the patently inappropriate heading "TERMS AND CONDITIONS APPLYING TO PURCHASE ORDERS HOWARD COUNTY, MARYLAND" somehow meant that the Policy could contain no pollution exclusion clause unless specifically agreed to by the County.[25] As discussed above, even the other language of the Bid Document simply does not support such a conclusion. Accordingly, I conclude, as a matter of law, that the Policy is, indeed, the insurance agreement and thus the pollution exclusion clause is applicable.

■ Having so concluded, however, I decline to reach the issue of whether, notwithstanding the applicability of the pollution exclusion, Howard County is still entitled to indemnification (or the costs of defense) for claims arising out of pollution damage to the property of third parties. The relevant inquiry, according to the language of the pollution exclusion clause itself, centers around whether the pollution damage at issue was "caused by a sudden, unintended and unexpected happening" during the Policy period. As stated with respect to the discussion of Section I of the Policy, this is an "occurrence" issue, which I am unable to address on the summary judgment record, for lack of an adequate showing by either party. More important, the question whether the pollution damage at issue was "caused by a sudden, unintended and unexpected happening" should be left for determination by the state court in connection with the underlying liti-

---

23. Murphy stated that he felt no need to make such an inquiry because he believed the terms and conditions of the insurance contract were those outlined in the Bid Document. Murphy Depo. at 105–06.

24. As discussed earlier, *see supra* note 11, Murphy testified that when he received the Policy in January 1986, he believed that it was not in accordance with what was negotiated. He failed, however, to explain as to the specific language with which he took issue and admitted he never took any follow up action in this regard. Murphy Depo. at 108–17.

25. The specific language Howard County relies on in this regard is as follows:

> 3. The terms and conditions of sale as stated in this order govern in event of conflict with any terms of seller's proposal and are not subject to change by reason of any written or verbal statements by seller, or by any terms stated in seller's acknowledgment, unless accepted in writing by purchaser.
>
> \*　　\*　　\*
>
> 15. Substitutions are not allowed unless specifically authorized by Purchaser.

Df's Mem. in Supp. of Cross Mot. for Summ. J., Exh. A1.

gation, where it will no doubt be one of the key issues to be decided.

## V. CONCLUSION

The summary judgment record established here makes it clear that there is no genuine dispute of material fact and that declaratory relief may appropriately be accorded the parties as a matter of law. For the reasons stated above, I have determined that: (1) the document which determines the rights and liabilities of the parties is the Policy document issued by plaintiff's predecessor in interest including the "Industries, Seepage, Pollution and Contamination Clause" NMA 1685, and not the Bid Document as urged by the County; (2) Section I Coverage A of the Policy is not subject to the "Industries, Seepage, Pollution and Contamination Clause" NMA 1685; (3) Section I Coverage A of the Policy does not provide coverage for property neighboring former or present landfills; (4) land owned by the County is excluded from coverage under Section I Coverage A of the Policy, however, groundwater "owned" by the County is not excluded; and (5) as a matter of law, pollution damage to the County's property was fortuitous and accidental, and not intentionally caused or expected.